### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY ZAGAMI, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>               v.<br><br>WOLFSPEED, INC., GREGG A. LOWE, and NEILL P. REYNOLDS,<br><br>                                    Defendants. | **Case No. 6:24-cv-01395-ECC-MJK**<br><br>**CONSOLIDATED AMENDED COMPLAINT**<br><br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................1

PRELIMINARY STATEMENT ............................................................................2

JURISDICTION AND VENUE ..............................................................................5

PARTIES...................................................................................................................6

SUBSTANTIVE ALLEGATIONS.........................................................................7

I.       WOLFSPEED AND THE IMPORTANCE OF THE MVF RAMP ...............................7

II.      OPERATIONAL DELAYS PLAGUE MVF RAMP AND INVESTORS WILL NOT
         "STOMACH" ANOTHER RESET, PLACING PRESSURE ON DEFENDANTS TO
         DELIVER ....................................................................................................9

III.     THE MVF RAMP STALLS ........................................................................11

IV.      DEMAND FOR WOLFSPEED PRODUCTS "FELL OFF A CLIFF" ...........................14

V.       DECLINING DEMAND FORCES WOLFSPEED TO SLASH PRICES .......................18

VI.      WOLFSPEED MANIPULATED ITS QUARTERY RESULTS ...................................20

VII.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS.........24

VIII.    THE TRUTH BEGINS TO EMERGE AS DEFENDANTS CONTINUE TO MISLEAD
         THE MARKET ...........................................................................................41

IX.      ADDITIONAL ALLEGATIONS OF SCIENTER ..........................................................51

         A.      The Critical Importance of the MVF Ramp and the Company's Supply to Meet
                 Demand Supports a Strong Inference of Scienter..................................52

         B.      Defendants' Regular and Detailed Statements and Responses to Analyst
                 Questions Concerning MVF Utilization and Demand Support a Strong Inference
                 of Scienter............................................................................................55

         C.      Defendants' Access to Information Concerning MVF Utilization and EV Demand
                 Supports a Strong Inference of Scienter.............................................56

         D.      Lowe's Admitted Frustration With the Low Price at Which Wolfspeed Stock Was
                 Trading Supports a Strong Inference of Scienter .................................59

i

E.    The Suspicious Timing of the Company's Purported Operational Turnaround Supports a Strong Inference of Scienter.............................................................61

F.    Defendants' Suspicious Assertions that EV Demand for Wolfspeed's Products Was Increasing When End-Market Demand Was Decreasing Support a Strong Inference of Scienter ...............................................................................................63

G.    The Suspiciously Timed Firing of Lowe Supports A Strong Inference of Scienter ...................................................................................................................66

H.    The Terms of Wolfspeed's Debt Instruments Supports A Strong Inference of Scienter...................................................................................................................67

X.    LOSS CAUSATION ........................................................................................................68

PLAINTIFFS' CLASS ACTION ALLEGATIONS....................................................................74

I.    FRAUD-ON-THE-MARKET PRESUMTION OF RELIANCE ...................................76

II.    APPLICABILITY OF PRESUMPTION OF RELIANCE: AFFILIATED UTE ............77

COUNT I.......................................................................................................................................78

COUNT II......................................................................................................................................81

PRAYER FOR RELIEF................................................................................................................82

DEMAND FOR TRIAL BY JURY ..............................................................................................82

## NATURE OF THE ACTION

1.     This is a securities fraud class action brought by Lead Plaintiffs Qiu Shaomei, He Jie, Cai Guangjian, and Dr. Syed M. Alam, and plaintiff William Maizner ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned counsel. The action charges that Defendants named herein violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2.     The Action is brought on behalf of all persons and entities other than Defendants that purchased or otherwise acquired the securities of Wolfspeed, Inc. ("Wolfspeed" or the "Company"), between August 16, 2023 and November 6, 2024, both dates inclusive (the "Class Period").

3.     Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wolfspeed, analysts' reports and advisories about the Company, interviews with former employees of Wolfspeed, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

4.      Wolfspeed is a global semiconductor company focused on silicon carbide ("SiC")
materials and the fabrication of devices for power applications. Wolfspeed largely targets its
products toward the electric vehicle ("EV") and industrial and energy ("I&E") sectors.

5.      On April 25, 2022, Wolfspeed announced the opening of its much-anticipated
Mohawk Valley Silicon Carbide fabrication facility ("MVF") in Marcy, New York. The Company
touted MVF as the world's largest 200mm silicon carbide fabrication facility.

6.      By early 2023, Defendants explained to investors that because of "overwhelming"
and "rapidly growing" demand in the EV market that far outpaced the Company's then-current
production capabilities, the production "ramp" of MVF was critical to the Company's success,
stating that "bringing on supply is really the critical focus" and "our growth will be governed by
how quickly we ramp 200-millimeter substrate capacity and, in turn, the Mohawk Valley fab…"

7.      However, by early 2023, Wolfspeed had announced several significant delays to
the MVF ramp caused by poor operational execution, with the Company repeatedly resetting
investor expectations as to when MVF would ramp to a meaningful production level. During the
most recent reset in April 2023, Defendants told investors that MVF would reach 20% utilization
by the June 2024 quarter, which would translate into $100 million in revenue in the December
2024 quarter.[1] At this point, given the critical importance of the MVF ramp to the Company's
short-term and long-term success, investors lost confidence in Defendants' ability to execute this
once-again revised schedule, with one analyst recognizing, "this is the last one [reset] investors
will stomach."

---

[1]     Wolfspeed's fiscal year ends on June 30 of each year.  Accordingly, Wolfspeed's first fiscal
quarter ends on September 30 (1Q); the second fiscal quarter ends on December 31 (2Q); the third
fiscal quarter ends on March 31 (3Q); and the fourth fiscal quarter ends on June 30 (4Q).

8.      Investors were then surprised and ecstatic following each of the next several quarterly earnings calls during the Class Period when Defendants announced that MVF was not experiencing any problems and was "on track" to achieve the 20% utilization by the June 2024 quarter and $100 million in revenue by the December 2024 quarter. Investors believed that the poor operational execution was finally behind the Company. For example, one analyst commented, "we believe investor focus will be on the increased confidence expressed by the management team relative to the ramp for [MVF], which has been the keystone to the bull thesis on the shares, and has been overshadowed in recent quarters by execution mishaps." Investors were further encouraged when, on June 24, 2024, Defendants announced that MVF had indeed achieved 20% utilization.

9.      Defendants also told investors that the only constraint on the Company's revenue and profits was the speed at which MVF could ramp because the demand and backlog for Wolfspeed's products, specifically from the EV market, would far outstrip MVF's supply for the foreseeable future. For example, as late as May 20, 2024, Lowe stated, "***The demand for our product is higher than the capacity we have. And the adoption of silicon carbide has also been substantially higher than we originally anticipated***."[2]

10.     In truth, MVF never achieved anything close to 20% capacity utilization. According to former employees who worked out of Wolfspeed's corporate headquarters as an Accounting Director and Financial Analyst and reviewed the Company's P&L statements and conducted financial reviews – which included information on MVF's utilization – MVF was not "getting to the level of volume" quickly enough," "w[as] far behind where [management] expected it to be," and by September 2024 was only at about 10% utilization. Moreover, according to these former

---

[2] All emphases included herein are added unless otherwise indicated.

employees, by January 2024, the demand for Wolfspeed's products, including from the EV market, had plummeted. And by June 2024, "there was definitely a lot of panic setting in" because "sales were falling and falling quick" and "orders were falling quick…across the board, in every business unit."

11.     Investors first began to learn the truth of the Company's overstated growth potential on June 20, 2024, when *Reuters* reported that Wolfspeed had "delayed plans to build a $3 billion plant in Germany" and "won't start construction . . . until mid-2025 at the earliest, two years later than its original target."

12.     On this news, Wolfspeed's stock price fell $2.24 per share, or 8.62%, to close at $23.76 per share on June 20, 2024.

13.     On the evening of August 21, 2024, the Company announced its fourth quarter fiscal year 2024 results, reporting adjusted quarterly losses of $0.89 per share, higher than analysts' expectations, and that revenue fell to $200.7 million for the quarter, lower than analysts' expectations. During the earnings call, the Company announced plans to close its production facility in Durham, N.C., as the Company tries to cut costs.

14.     On this news, Wolfspeed's stock price fell $0.93, or 6.76%, to close at $12.83 per share on August 22, 2024. As the market continued to process the news, the stock dropped an additional $4.86, or 34.78%, during the period of August 26, 2024 to September 3, 2024, to close at $9.11 per share on September 3, 2024.

15.     Then, on November 6, 2024, Wolfspeed announced its financial results for the first quarter of fiscal year 2025 and unveiled guidance for the second quarter well below expectations. While Defendants had repeatedly claimed that 20% utilization of MVF would result in $100 million of revenue out of the facility, Defendants now guided to a range 30% to 50% below that

4

mark.  The Company attributed its results and lowered guidance to "demand … ramp[ing] more slowly than we originally anticipated" as "EV customers revise their launch time lines as the market works though this transition period."  Moreover, as a result of the revealed poor prospects, the Company was forced to take drastic steps, including laying off 20% of its workforce, shutting down the Durham, N.C. facility, and scrapping plans for a $3 billion plant in Germany.

16.    On this news, Wolfspeed's stock price fell $5.38 per share, or 39.24%, to close at $8.33 per share on November 7, 2024.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a significant portion of Defendant Wolfspeed's business, actions, and the subsequent damages to Plaintiffs and the Class took place within this District.  Specifically, Wolfspeed opened a $1 billion, 200mm silicon carbide fabrication facility at the Marcy Nanocenter, located on the State University of New York Polytechnic Institute campus in Marcy, Oneida County.  Wolfspeed referred to this facility as MVF.  This case centers on MVF's profitability and production.

20.    Plaintiff William Maizner is domiciled in Dix Hills, New York.

21.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

22.    Plaintiffs, as set forth in the previously filed Certifications, ECF Nos. 1-1, 18-4 and 19-6, acquired Wolfspeed securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

23.    Defendant Wolfspeed is a North Carolina corporation with its principal executive offices located at 4600 Silicon Drive, Durham, NC 27703.    During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "WOLF."

24.    Defendant Gregg A. Lowe ("Lowe") has served as Wolfspeed's President, Chief Executive Officer ("CEO"), and Director at all relevant times. On November 18, 2024, the Company announced that its Board of Directors had "determined" that Lowe "will depart this month from his roles as Wolfspeed's President and [CEO] and as a member of the Board."

25.    Defendant Neill P. Reynolds ("Reynolds") has served as Wolfspeed's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. On April, 30, 2025, the Company announced that it "has mutually agreed with Neill Reynolds to conclude his role as Executive Vice President and Chief Financial Officer, effective May 30, 2025."

26.    Defendants Lowe and Reynolds are collectively referred to herein as the "Individual Defendants".

27.    The Individual Defendants possessed the power and authority to control the contents of Wolfspeed's SEC filings, press releases, and other market communications.    The Individual Defendants were provided with copies of Wolfspeed's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Wolfspeed, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     Wolfspeed and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## I.    WOLFSPEED AND THE IMPORTANCE OF THE MVF RAMP

29.     Wolfspeed is a global semiconductor company focused on silicon carbide materials and the fabrication of devices for power applications. The Company's silicon carbide materials products consist of silicon carbide bare wafers, epitaxial wafers, and GaN epitaxial layers on silicon carbide wafers. The Company's power device products consist of silicon carbide Schottky diodes, metal oxide semiconductor field effect transistors (MOSFETs) and power modules. Wolfspeed's products are used in a wide range of applications, including powering electric vehicles, renewable energy systems, industrial equipment, data centers, and aerospace applications.  During the Class Period, Wolfspeed largely targeted its products toward the electric vehicle and industrial and energy sectors.

30.     Prior to the Class Period, Wolfspeed's products were primarily manufactured in a production facility located in Durham, North Carolina.

31.     On April 25, 2022, Wolfspeed announced the opening of its much-anticipated MVF in Marcy, New York. The Company touted MVF as the world's largest 200mm silicon carbide fabrication facility.

32.    Defendants repeatedly acknowledged that the production "ramp" of MVF was critical to the Company's success. The ramp of MVF was also identified by analysts as the most important issue for Wolfspeed.

33.    For example, during its 2Q23 earnings call held on January 25, 2023, the Company announced that while the demand for the Company's radio-frequency ("RF") products had declined, "we continue to see strong demand for our silicon carbide solutions," specifically describing the demand in the EV market as "*overwhelming*" and "***rapidly growing***." Reynolds stated that the only limitation on the Company's revenues and profits would be its ability to increase supply to meet that demand: "So first of all, let me just say, overall, we're continuing to see very, very strong demand across both power devices and materials. And as we previously discussed, for both of those areas, that's going to be much more of a supply situation rather than it being a demand situation. ***So bringing on supply is really the critical focus there***."

34.    Lowe echoed the critical importance of the ramp of MVF: "We're at an inflection point right now where we are running material through Mohawk Valley. We are planning for revenue coming out of that factory in the fourth [June] quarter…as we qualify the product. The yields that we're seeing on the preproduction runs right now give us substantial confidence in being able to do that. And in fact, they're running higher than we would have anticipated at this point. So we're really, really happy with that… ***[W]e're going to see a substantial increase in capacity coming online, which obviously will help us satisfy that substantial demand that's out there***."

35.    Reynolds also explained that the EV-related demand was important for the Company securing much-needed funding for its significant capital needs, stating, "We were

extremely encouraged by the demand we see in the marketplace and believe it sets us up well to secure further funding."

## II.    OPERATIONAL DELAYS PLAGUE MVF RAMP AND INVESTORS WILL NOT "STOMACH" ANOTHER RESET, PLACING PRESSURE ON DEFENDANTS TO DELIVER

36.    However, between the announcement of the facility opening and the start of the Class Period, the timeline of the ramp was delayed multiple times as a result of operational problems.

37.    During the January 25, 2023, 2Q23 earnings call, Defendants announced that the ramp of MVF had been delayed one quarter.

38.    The ramp of MVF to meet the purported overwhelming demand, as well as any delay thereof, was of the utmost importance to investors. A January 25, 2023 Wells Fargo report stated, "While WOLF's 2Q23 results & 3Q23 guide were below prior views, we believe WOLF shares should be bought on any sell-off. *What is important is that WOLF's SiC mkt footprint is expanding & MV is set to ramp in 2H FY23*."

39.    Similarly, a January 26, 2023, BNP Paribas report stated, "*1Q delay on MVF ramp-up and more conservative approach* Co indicated that the ramp-up of MVF (Mohawk Valley Fab) has been delayed 1 quarter. Mgt is now taking a more conservative approach and flags ramp-up is dependent on ability to complete customer qualifications and supply of 200mm wafers. Initial MVF revenue is now forecast at a couple of million in Jun-Q (FQ4) and potentially ratchet up to $100m level over a couple of quarters."

40.    A January 26, 2023, JP Morgan report stated, "More importantly, with limited visibility in an RF recovery as well as Durham's Power Device revenue reaching capacity, *the financial performance and the investment thesis has now become even more disproportionately weighted towards a successful ramp of MVF*."

41.     A January 26, 2023, William Blair report stated, "On the call, management acknowledged revenue from Mohawk Valley was pushed out a quarter, and now expects single-digit millions recognized in the fourth quarter. This is in line with our expectations that we laid out in our preview note. Although disappointing in the near term, ***our focus lies on the value of Mohawk Valley looking past the next two quarters***."

42.     During the Company's 3Q23 earnings call held on April 26, 2023, discussing fiscal year 2024, Reynolds acknowledged that the Durham facility was running at full capacity and, therefore, "our growth will be governed by how quickly we ramp 200-millimeter substrate capacity and, in turn, the Mohawk Valley fab…" The Company also announced another one quarter delay in the MVF ramp-up as a result of a supply issue, but stated that the supply issue had been resolved and that MVF would achieve 20% capacity utilization by 4Q[June]24. Lowe stated, "***We're going to get to 20% utilization out of that fab in the end of fiscal '24, which will have pretty significant output***." Reynolds also stated that the 20% utilization was an assumption underlying the Company's fiscal year 2024 guidance.

43.     On the issue of demand, Lowe described it as "robust," "substantially high" and that "***the demand is pulling in and steepening***."

44.     The critical importance of the Company reaching the 20% utilization rate in light of the purported overwhelming demand was highlighted by analysts.

45.     For example, an April 26, 2023, Canacord Genuity reported stated, (i) "Mohawk Valley ramp delayed again," (ii) "20% utilization at Mohawk Valley is a critical milestone," (iii) "all future growth will be coming out of Mohawk Valley," and (iv) "SiC is in high demand."

46.     A Piper Sandler report stated, "***probably the largest and most meaningful item in the earnings call was the delay in the ramp of the MVF facility***. The company expects that by the end of FY24 it will achieve 20% capacity utilization."

47.     A Wells Fargo report stated, "***Timing of Mohawk Valley Ramp is Key***."

48.     A BNP Paribas report stated, "***Main takeaway from conf-call is that after a 1 quarter pushout in FQ2, the co has now further pushed out the ramp-up of its MVF fab by another few quarters***."

49.     The frustration from the investing community was significant as analysts recognized that another major setback in the ramp-up would be disastrous for Wolfspeed.

50.     For example, an April 27, 2023, Morgan Stanley report stated, "***It is important that management resolves these issues***, as this seems like more than a transitory problem. FY24 guidance, for the first full year of Mohawk Valley, was the guidepost for much of the last 3 years, so ***to fall this far short is a blow to investor confidence***."

51.     A William Blair report stated, "We believe this reset is finally deep enough for realistic expectations, and ***we believe this is the last one investors will stomach***."

## III.     THE MVF RAMP STALLS

52.     Former Employee ("FE") 1 worked for Wolfspeed from June 2023 to September 2024 as Global Cost Accounting Director out of Wolfspeed's corporate headquarters office in Durham, N.C. FE1 reported to Vice President, Corporate Finance Chuck Burnside, who reported to Defendant CFO Neill Reynolds.

53.     As Global Cost Accounting Director, FE1 oversaw standard costing, inventory evaluation and inventory accounting, which included preparing monthly internal margin reviews. FE1 had access to information about MVF's utilization because FE1 was responsible for reporting the "actual results" of MVF in the form of a monthly "financial review" or "P&L" review. The

11

P&L reviews were maintained in Microsoft Excel spreadsheets and stored on a shared Microsoft OneDrive server. According to FE1, there was a tab for Companywide revenue and cost margin, along with separate tabs showing those figures for the Company's plants in North Carolina and New York, along with subcontractors in Asia.

54.    The monthly P&L reviews conducted in part by FE1 included information about MVF's utilization because if the facility was "not hitting" the "planned utilization," Wolfspeed would need to "carry a variance," which FE1 had to apply. FE1 also participated in a monthly call about the P&L reviews with Senior Vice President, Finance Kevin Speirits and the Company's plant controllers and business unit controllers. During these calls, FE1 would "read[] out and explain[]" these results to Mr. Speiritis.  FE1 "would have assumed" that Lowe and Reynolds received the P&L reviews.

55.    FE2 joined Wolfspeed in February 2024 as a Financial Analyst working for the Company's "Discrete Power Devices" business unit. FE2's role involved "analyzing the profitability" of MVF and the Durham facility, which then "rolled up into a final profit and loss statement," FE2 said.

56.    FE2 reported to Senior Director – Power Finance, Hunter Lane. FE2 said that Lane reported to CFO Neill Reynolds, either directly or through a vice president.

57.    According to FE1, Wolfspeed was "slower" to get MVF "up and running." Moreover, once MVF was up and running, the Company wasn't "getting to the level of volume" quickly enough, FE1 said. In manufacturing, "that's the numbers game. You've got to get it up fast and run it fast," FE1 said, "and if you don't, that can cripple you quickly, financially speaking." FE2 likewise stated that the fact that MVF was not hitting its targets was clear to him upon joining the Company in February 2024. While he did not remember exactly where MVF was in reaching

20% utilization during his tenure at Wolfspeed, "all I can say is they weren't where they needed to be, and that that was a big issue." Asked how he knew MVF was not where it needed to be, FE2 said, "It was just open knowledge," and that the facility's issues were a "driving force" causing a "lot of financial issues." FE2 said he recalled "as soon as I joined" having conversations with other analysts and with the pricing and engineering teams about the fact that MVF was not where it should have been. "It wasn't a secret internally," he said. "It just seemed we were supposed to be at a certain level, and we weren't at that level. That's how I saw it and how it was conveyed to me."

58.    FE1 stated the original target for MVF was 20% utilization.  However, "by the time we got to the point of the margin review, everyone knew we weren't hitting the number." FE1 said he[3] and others on the Finance side were "asking questions" and seeing that the P&L "doesn't look like where we're forecasted."

59.    Moreover, during the "margin reviews" he conducted, he would be looking for what the "absorption should have been." During this process, he could tell that "we weren't hitting 20% absorption." FE1 said that "absorption rate" and "utilization rate" were "one and the same" but that utilization was typically "quantity-based" and absorption was more on a "dollar basis."

60.    Specifically, in regard to whether MVF reached 20% utilization by 4Q24 (June 2024), FE1 stated, "I never saw that number." "I never saw anything with that 20% on it internally." FE1 said, "It wasn't 20% utilization…It wasn't 20% of capacity, which was what the original target was." To the contrary, FE1 stated that when he left the Company in September 2024, MVF's utilization rate was "only at like 10%." FE2 likewise stated that by June 2024, the production at the Mohawk Valley facility "w[as] far behind where they expected to be." FE2

---

[3]    All FEs are referenced using male gender pronouns to protect their identities.

stated, "There were products coming out but not nearly as much as should have been." FE1 said "there was a lot of pressure on the local team in New York" about not hitting the 20% utilization rate.

61.    FE1 stated that Wolfspeed's failure to get to the $100 million revenue mark from MVF was due both to not reaching the 20% monthly or quarterly utilization rate at Mohawk Valley and because "they had declining sales."

## IV.    DEMAND FOR WOLFSPEED PRODUCTS "FELL OFF A CLIFF"

62.    FE2 said that Wolfspeed's senior leadership exaggerated the general demand for the Company's 200 mm wafer in the electric vehicle market, and that it was "without a doubt" true that Wolfspeed's projected revenue outlook and anticipated growth was overly optimistic.

63.    FE2 said demand began declining during FE2's first month at Wolfspeed in February 2024: "[T]he volume or the demand just fell off a cliff." He said that "as soon as I joined" Wolfspeed, demand went down, pricing decreased and "customers were falling off the face of the planet." FE2 explained that the drop in demand was "pretty much across the board" and that "the Auto sector felt it," confirming that he recalled demand dropping dramatically for the EV sector. "To be honest, it was pretty ridiculous," FE2 said. "I felt pretty misguided" because during FE2's job interviews, FE2 was told that there was "so much demand" and that Wolfspeed could capitalize on "lots of untapped growth" in a "huge market." "I do feel like I was lied to by where things were going," FE2 added.

64.    Discussing the Company's demand and revenue, FE2 said he knew about these figures based on "what I saw coming in when looking at" the Company's P&L statements, including actual performance versus forecast. "If you can imagine a car driving off a cliff crashing into a ravine, that's basically what happened," FE2 said.

14

65.     FE1 likewise stated that Wolfspeed's projected revenue outlook and anticipated growth was unrealistic. FE1 knew this based on direct conversations FE1 had with the Company's Sales financial analysts and controllers, who communicated to him that the "Sales folks think" the Company had set an "unrealistic number." "In talking to the other analysts under the business units, they would say, 'The Sales team said this and that,'" he said. "The Sales team was getting frustrated," FE1 said; "they felt like they were signing up for a number they didn't have a clear path to."

66.     "I think [management's] expectation around the volume didn't match with reality," FE1 said. The "reality" was that "over the last two years, the EV market has changed drastically," FE1 said, referring in part to government initiatives that did not materialize as hoped.

67.     FE1 likewise confirmed that demand had plummeted by early 2024. Specifically, in January and February 2024, there were "a lot of concerns around softening demand," which came up in part during the "budgeting process." Moreover, the "market was declining pretty quickly," FE1 said.

68.     "It was a pretty quick decline from a demand perspective," FE1 said, explaining that Wolfspeed had been operating with "quite a bit of backlog," including even at the end of 2023. The Company went from an "environment" where it "can't meet the demands of customers," who would "get mad" about not being able to get orders "fast enough," but "it flipped really quickly. We ate up our backlog," he said. FE1 said it was probably in February or March 2024 that Wolfspeed had eaten up its backlog. At this point, there were "a lot of concerns around cost pressure, on cost. 'We've got to figure out how to reduce costs' because we didn't have the top line," he said.

69.     By June 2024, "you could feel the pressure" and "there was definitely a lot of panic setting in" because "sales were falling and falling quick" and "orders were falling quick," adding that there was a "significant drop-off in orders." This was true "across the board, in every business unit." FE1 said he knew this in part from seeing the Company's "final rollup" budget, which included sales, margin and net income.[4] It was FE1's understanding that the final rollup documents would go to Lowe and Reynolds.

70.     FE2 said the declining demand was due to several factors. One factor was that expectations for the U.S. electric vehicle market "were too aggressive." FE2 said many people thought EV chargers would be installed "everywhere" due to "this green initiative," and "that just didn't happen."

71.     Another factor was that the "China market was affecting everything," explaining that there were Chinese companies selling the "same caliber" of parts for less—as much as 50-70% less. "It was pretty significant," FE2 said.

72.     Yet another factor for the declining demand was the fact that customers and others in the industry "started to not believe" the "story" or "call to differentiation" that Wolfspeed was selling in regard to the superiority of its product and uniqueness of its manufacturing process, FE2 said. To customers, the claim that Wolfspeed's "wafer" was "super special" "wasn't believable," FE2 said. Wolfspeed "had a manufacturing process that was supposed to be unique, and I think that over time – the technology, you can only have a cap on technology so long. I think competitors developed an ability" to compete with Wolfspeed's process, FE2 said.

73.     Importantly, and as noted above by FE2, falling demand became known within the Company no later than February 2024.

---

[4]    A rollup groups accounts together for reporting purposes.

74.     According to FE2, Senior Director – Power Finance, Hunter Lane (who reported to Reynolds) and others were "constantly fighting" within the Company "to say, 'look something has to change,'" referring to "wafer cost and pricing decisions that needed to be made."

75.     FE2 said "there's no way" that senior leaders such as CEO Lowe and CFO Reynolds "couldn't have known" about the falling demand, given that "everyone was aware that there was an issue." FE2 reiterated that the declining demand was "definitely a problem that was talked about" generally throughout the Company, adding that "I brought it up on some occasions." "If they were unaware that the demand was on the floor at that level, I would genuinely be flabbergasted," FE2 said.

76.     FE2 said he and his colleagues sent weekly reports to the Vice-President level of the Company with data on revenue, backlog, price, cost, facility performance and demand planning, which reflected the declining demand. "You know that last quarter you have X amount and this quarter you have 50% lower" in revenue, FE2 said, explaining how the reports would indicate declining revenue and demand. "I as an analyst with other teammates was creating the reports at Hunter Lane's request for reporting," FE2 said. The reports were "definitely sent to the chain" of employees "underneath" Lowe and Reynolds, including those at the vice president and director level, FE2 said.

77.     Additionally, FE2 said that Senior Demand Manager Matthew Bolick "would point to this crazy demand schedule that I never thought – there was no way they were going to achieve it," adding that this was discussed in meetings that FE2 participated in. "There's no way they couldn't have known," FE2 said, referring to senior leadership's knowledge of the declining demand.

## V.    DECLINING DEMAND FORCES WOLFSPEED TO SLASH PRICES

78.    FE2 said that a reason that Wolfspeed's asserted 20% utilization at MVF did not materialize into $100 million in projected revenue in the last fiscal quarter of 2024 was because demand for the Company's products dropped drastically, forcing the Company to significantly lower prices on some parts.

79.    FE2 said that at the same time that demand dropped, Wolfspeed implemented "significant" price cuts due to the sharply declining demand, including some cuts "as large as 50%." These cuts would have included parts made at MVF, FE2 said. FE2 knew about Wolfspeed's price cuts because he "worked directly with the pricing team."

80.    FE2 said he thinks "part of the issue with price" was that Wolfspeed had "a lot of inventory in the channel that was at a certain price. "I know Discrete Power Devices had significant inventory buildup – that went across I&E and Auto businesses," FE2 said. Wolfspeed was "sitting on hundreds of thousands of pieces of inventory," waiting for "months" with the "price not going any higher," FE2 said. "We definitely pushed for some sort of change," FE2 said, adding that he and others stressed that "we can't just assume" that the "price will return up." "I know that that conversation in many different ways was being pushed," FE2 said, referring to discussions about the "amount of inventory, prices of product" and related to the "cost to make the products," the "wafer costs." FE2 said that they had so much inventory that by the time they started selling out, the prices in the market were substantially lower." There was "already a lot of saturation in the market," FE2 said, adding that customers were "not going to buy" parts at the "top price" if there were lower options available.

81.    FE2 indicated that Wolfspeed attempted to offload built-up inventory in part by offering it to other customers, including across sectors. "The problem is," he said, that the "way wafers are made and dyes manufactured, you can't just say shift" product from I&E or Discrete

Power Devices to Auto because it "doesn't meet specifications for those devices." Although doing this is possible "in some instances," it often is not, he said. "It just doesn't work that way unless you make some sort of manufacturing change to the device," he said. For the most part, "you can't just swap and shift these parts," he said. "They're typically user-specific. Customers will send product requirements that Wolfspeed meets. And typically, those are the specific products that are getting filled into the distributors' shelves."

82.     Another part of FE2's job was to determine the cost of products, and to then use that information to "help the pricing team determine pricing," FE2 said. FE2 and his colleagues would say, "'This is what the market wants. This is what we have to sell it for,'" FE2 said. "The trend was, 'We can't sell it for this. We have to sell it for a loss. We have so much in the market. We have to take a loss.'"

83.     FE2 said he and a couple other analysts worked under Senior Director – Power Finance Hunter Lane and "were all saying the same thing to him" about the fact that changes were needed with regard to wafer costs and pricing decisions. During calls that FE2 and his colleagues had with Lane on a "regular cadence," they conveyed to him that "there were issues." FE2 said he and his teammates also worked with the "pricing team director" and "pricing team," who were "more than aware of what was happening with price" and declining demand and "what volume looked like."

84.     FE2 said that "whenever things really started to fall, Hunter, I believe, was trying to make it more than apparent that, look, there's a problem, when it came to upper management." "From my understanding, it was a message that was repeatedly conveyed to upper management," including from Lane, the pricing director, the business unit managers and factory leads, FE2 said. Lane "definitely conveyed to us" that "he shared" with upper management "that there were issues"

with falling demand and pricing, FE2 said. "It was also just obvious: We're all sitting there looking at the information. 'Hey, this isn't good,'" he said. "We would be very blunt about that."

85.     FE1 similarly recalled that toward the summer of 2024, as the Company was "talking about budgeting and forecasting" for its next fiscal year, which began in July, "there was a lot of back and forth and concern being expressed at that time around those numbers." When FE1 left the Company in September 2024, three months into the Company's fiscal year 2025, ***the Company still did not have a budget in place***. The budget process had been going on for four months and had gone through an unusually high "amount of iterations," FE1 said. It was FE1's understanding that the final rollup budget documents would go to Lowe and Reynolds. After talking through things in the final rollup process, FE1 said he assumed there were other conversations going on with Lowe and Reynolds, after which "it would be, 'We're doing the budget again. Try again.'" FE1 confirmed that the constant back and forth between rollups and budget/projections was due to the falling demand "and how to adjust to it – where we can cut costs, how do we help save margin." When FE1 was leaving Wolfspeed, "there was a lot of panicking around demand" in general.

86.     FE2 said that "what they should have done" when the Company's volume and demand dropped was "take it on the chin, own up to the fact that" the volume and demand had declined.

## VI.    WOLFSPEED MANIPULATED ITS QUARTERY RESULTS

87.     FE1 emphasized that while he had worked at other publicly traded companies where there is a "level of pressure" to meet numbers, "the pressure to meet certain numbers" at Wolfspeed was "beyond anything I'd experienced."

88.     FE1 said that he and other higher-paid finance employees received their bonuses based on the Company meeting certain targets over which they did not, and should not, have direct

influence, which was unusual. FE1 explained that "typically speaking," higher-paid finance employees might receive a "bonus payout" based on company results – but their "individual goals" are based on things like "efficiency, processes, accuracy, audit." However, at Wolfspeed, "one of the *individual* goals" for "everyone on the Finance team was meeting certain margin targets." "You see how that doesn't make sense?" FE1 said. "I think that just speaks to the pressure." FE1 and other Finance employees "can't directly" impact the margins, he said, adding that they "shouldn't be able to." Therefore, the arrangement "doesn't make sense," FE1 said.

89.     Then, at the end of each quarter, FE1 and other Finance employees would roll up the Company's results and review them – and then always received a response from Speirits that the numbers were "not good enough." Speirits would then ask, "Can we get this number?" "It was sort of a joke – they called it 'diving for dollars' at the end of each quarter," FE1 said. FE1 recalled hearing the phrase after his first quarter working at Wolfspeed. "One of the controllers made the joke – 'It's time to dive for dollars,'" FE1 said, confirming that this referred to "that quarter-end push to go find more money from a financial perspective."

90.     FE1 would then have to look for potential adjustments to be made in "inventory reserves" and "capitalized variances."

91.     Regarding inventory reserves, FE1 explained that after inventory goes on the books at a certain dollar amount, technical accounting standards stipulate that "you need to challenge the value" of inventory on the books as time passes. Typically, companies reduce the value of inventory by certain percentages after certain time intervals, such as after six months, 12 months, etc.

92.    Recognizing that "old, aging inventory on the books will reduce value on the balance sheet," FE1 explained that putting inventory reserves on the books "reduces inventory value," which is an "expense to P&L."

93.    However, during this process, companies can make "exceptions" for aging inventory if "we have a customer for it," for example. "In that process, there's a review where we say, 'What do we have demand for? Is it going to move?'" he said. If a company decides "not to reserve it," this is an "improvement to P&L" because the Company is "not taking a hit for something that is aging," he said.

94.    In regard to capitalized variances, FE1 said the Company sets a standard cost when it budgets for the expected cost to make each unit. Changes based on volume or increases to labor or material costs "can make actual production costs be different in our budgeted costs versus expected costs," he said. Specifically, when a company sets the cost of items, it assumes that cost at a certain production volume and spend level. If the company does not hit that production volume, the "inventory-per-item costs you more to make." This different expected cost per unit versus actual cost per unit "gets put on the balance sheet two different ways: underutilization, or what people called capitalized variances," he said.

95.    "The more you move to underutilization versus capitalized variances, that difference between the two impacts your margin," FE1 said.

96.    Basic accounting principles stipulate that expenses and revenues need to align for any given period. Capitalized variances come into play "if you spend more than budget," with an "increase to inventory, which is a credit back to P&L until you sell it," at which point you "do the opposite," he said.

97.    At Wolfspeed, there was "pressure" at the end of the quarter in "these two areas" – inventory reserves and capitalized variances. Capitalized variances and inventory were the two areas where FE1 noticed the pressure because this was where "you could pull a string quickly," he said.

98.    At the end of each quarter at Wolfspeed, the response to rollups submitted by FE1 and his colleagues – showing the Company was "not where" it was "expected to be" – was, "'Are you sure that's right? Are you sure that's right? Go look at capitalized variances again. What if we did this? What if we did that?'" This would go on for a week or two weeks or more after each quarter, he said.

99.    FE1 said controllers at each of Wolfspeed's plants were "getting the pressure to go back again" and look for ways to make adjustments.

100.    Asked if it was true that there was pressure to say there was demand for aging inventory – thereby permitting Wolfspeed to make an exception in regard to inventory reserves – even though there might not have been an actual demand, FE1 said, "Yeah, there was a lot of pressure on the controllers to do that. 'Are you sure that we don't have demand for this? I think we're going to sell it.'"

101.    Asked if Wolfspeed essentially used capitalized variances to push off acknowledging increased costs by saying that it would match them with sales in the future, FE1 said, "It was never said that way, that blatantly. It was more along the lines of, 'Are you sure that cost is right? We need to spend some more time with it. So let's not recognize it just yet.'" "The undertone was there," he said. The pressure never occurred via email or in writing. "It was always a phone conversation," FE1 said.

23

102.    This process took place "every quarter end that I was there," including in January and February 2024 – the time when "demand was falling," FE1 said.

103.    FE1 stated: "It was right on the line" of being unethical, and the "pressure" applied by Wolfspeed made FE1 "uncomfortable."

104.    FE1 left Wolfspeed in September 2024 because "there was a lot of pressure in the wrong way." "There was a lot of tension, a lot of pressure to hit certain targets. It was not a fit."

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

105.    The Class Period begins on August 16, 2023, when Wolfspeed filed a Form 8-K with the SEC, containing the Company's financial results for the fourth quarter fiscal year 2023, and held a corresponding earnings call.  During the call, CFO Reynolds acknowledged, as he had in the past, that "*the main driver of future revenue growth for power devices will be the incremental revenue contribution from Mohawk Valley*."

106.    Reynolds then reassured investors that "*we are still aligned on previous expectations that we will reach 20% utilization out of Mohawk Valley by the end of fiscal 2024,*" and "*it is important to note that it will be the second half of the calendar year 2024 before we see $100 million of quarterly revenue from the fab that the 20% utilization would represent*. This accounts for the time between fab starts and shipments to our customers."

107.    During a question-and-answer segment that followed the Defendants' prepared remarks, an analyst from Piper Sandler  Co. asked, "It's pretty clear that your future growth of the company lies with Mohawk Valley, so maybe you could talk about what you want to see happen in that fab to ramp that facility,…you're talking about a $100 million achievement in the second half of 2024…what do you need to see at the fab to get to that kind of a number?"

108.    In response, Lowe stated, "In terms of the ramp of the production and the expectation for the amount of revenue. ***Our expectation is that we'll be at 20% utilization by the June quarter***."

109.    Reynolds followed on Lowe's assertion, stating, "***So as we get the 20% towards the end of the year, you wouldn't expect to see the revenue translation of that, as we get a 20% utilization, say, by the June quarter, we wouldn't expect a revenue translation of EPI, the equivalent of $100 million to be sometime after that sometime in the second half of calendar '24.***"

110.    Defendants' statements referenced in ¶¶106-109 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; and (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period.

111.    Following numerous delays in the ramp of MVF and resets of utilization expectations – and having recognized that investors would not "stomach" yet another reset – analysts were relieved and encouraged by Defendants' assertion that the operational problems that had plagued the ramp were behind the Company. For example, an August 2, 2023, JPMorgan report stated, "***what we believe should be more of a focal point for investors, is that F4Q results were headwind free as it relates to ongoing ramps at Durham, MVF and now JP following multiple quarters of execution challenges and delays***."

112.    Similarly, an August 16, 2023, Wells Fargo report stated, "***Timing of Mohawk Valley Ramp Remains Key; FY24 Tgt Reaffirmed***….While WOLF reaffirmed it remains on track to reach 20% utilization by FY24-end, it won't be until CY 2H24 (FY 1H25) before $100MM of

qtly revenue from the MV fab will be realized due to lag effects between fab starts and shipments to customers. Additionally, WOLF will continue to forecast $100MM/qtr of power device revs from Durham. WOLF reaffirmed its FY24 rev tgt of $1.0 to 1.1B." An August 17, 2023, BMO Capital Markets report stated, "Mohawk Valley. Wolfspeed continues to expect ~20% utilization at its Mohawk Valley fab exiting FY24, with $100M in quarterly revenues to follow, exiting CY2H24."

113.    On October 30, 2023, the Company reported its first quarter results for fiscal year 2024.  During the corresponding earnings call, Defendants detailed the importance of MVF's ramp to the Company's success and confidently detailed the progress thus far. Lowe stated, "By the end of this quarter, we will be producing enough material to support 15% utilization at Mohawk Valley, ***putting us nicely on track for our goal of 20% utilization by June of 2024***." Later during the call, in response to an analyst's question, Lowe repeated his unwavering confidence: "First off, you're right, Building 10 is in great shape right now. We'll be producing material in this quarter that will be able to support 15% utilization. And obviously, we have 2 quarters after that to get to 20% utilization in Mohawk Valley. ***So that's in really great shape…we are on track to 20% utilization in the June quarter***."

114.    Reynolds echoed Lowe's assurances, stating, "***We are still extremely confident in our ability to achieve 20% utilization in the fab by June.*** As we indicated on our last call, there will be a lag between 20% utilization and $100 million of quarterly revenue due to the time between fab starts and shipments to our customers." In response to an analyst's question, Reynolds repeated, "As you look out at the end of the year, we're still on target to get to 20% utilization…So once we get to the 20% utilization, there'll be a bit of a lag as you work through those cycle times and then you see the revenue that corresponds to that. So in this case, once we get to 20% in that

26

June time frame, we anticipate that being translating from a revenue perspective to about 100 million in revenue. As we get to December quarter next year."

115.    Defendants' statements referenced in ¶¶113-114 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; and (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period.

116.    Lowe also assured investors that existing products and demand as of October 30, 2023 was already well above a 20% utilization at MVF: "those products we have already qualified have sufficient demand to more than satisfy our short-term 20% utilization target." Specifically, Lowe told investors that demand from automotive customers remained high and would remain so:

> On the demand side, as I said, *we recorded $2.2 billion of design-ins*, the third largest amount of any quarter in our history. *It had a record design wins of $1.4 billion*, illustrating our customers' willingness to move into volume production on projects that we've won over the past few years. *Our design win record for the first quarter represents more than 230 projects, many of which are converting sooner than our original expectations. Most of these projects serve the automotive end market*, and we are steadily ramping our design-ins to design wins with major OEMs and Tier 1s. *We remain confident that the demand from automotive customers will remain strong* while we are seeing some softness in the industrial space, primarily in China and Asia. Additionally, we had a record quarter for 150-millimeter wafer revenue, a strong signal that the demand for materials remains solid…*Demands for our materials remain strong*.

117.    Later, Lowe again stated, "Demand remains strong across the business outside of the industrial and energy markets, particularly in China and Asia" and "Despite the current softness in China and Asia, *demand remains high for our products, and customers' needs are higher than our current output levels*. And this is why we are keenly focused on ramping Mohawk Valley to 20% utilization." In response to an analyst question specifically regarding EV demand, Lowe stated "*the demand that we're seeing both near term and long term is very, very solid*…So

basically, silicon carbide is enabling longer range. It's enabling faster charging, and it's enabling lower systems cost. And that's kind of a trifecta for EVs. ***So any of the noise that you see today, it certainly has no impact on our demand, both near term and long term***."

118.    In response to another analyst's question about supply versus demand over the next two years, Lowe told investors that the demand the Company currently had would outstrip its ability to supply for years to come: "there is going to be a supply-demand mismatch. ***There will be more demand than there will be supply certainly over the next couple of years and probably a lot longer than that***…So there's a lot of noise about different folks coming online, but the demand for our materials is very, very strong…So ***I really don't anticipate a demand being below supply for any time in the future, really the next couple of years for sure and probably the next half of the decade.***"

119.    On the issue of demand, similar to Lowe, Reynolds stated, "As Gregg said, very heavy demand particularly in the automotive side right now." He also stated, "So if we look at the revenue outlook as you go into the second half of the year, in fact, from an auto perspective, as Gregg said, very, very heavy demand. I think that's across U.S., that's in Europe, that's in Asia. So we're seeing the heavy demand there…. I'm still very heavy demand from automotive customers from China as well…And the third piece to that is on material side, as Gregg mentioned, we're still seeing very strong demand for 150 millimeter wafers as well. So we're seeing, I think, demand heavy in automotive devices demand heavy in 150-millimeter substrates, a little bit of softness in industrial energy perspective."

120.    Lowe also confirmed that he had actual knowledge of the ramp and any problems or delays that were occurring as he had personally visited MVF regularly:

> As material goes through these tools and the factory, we're seeing great results as they go through the tool. What we're seeing, though, is that the downtime or the

28

maintenance required is higher than it should be right now. And again, I was in the fab last week. I met with the engineers at both the tool side as well as our side. And there's a very good line of sight for what we need to do to get the tool up time where it needs to be. And as soon as that happens, our ability to transition from relatively low utilization to -- towards this 20%, it should be a very, very good snap as we fix that. *As I mentioned was in the fab last week. I will be in fab 2 more times in November, including on Thanksgiving Day to continue the focus of Mohawk Valley Ramp to 20% utilization*.

121.    In his closing statement, Lowe again reassured investors on demand and the ramp of MVF: "Just two thoughts before we end the call. One, *demand remains very strong for silicon carbide*; and two, *I am personally laser-focused on the Mohawk Valley ramp to 20% utilization in the June quarter*."

122.    Wolfspeed's stock price jumped as investors were again reassured that the prior delays in the MVF ramp were a thing of the past for the Company. For example, an October 30, 2023, TD Cowen report stated:

- "*Shares are up >10% as incremental signs of MVF progress are a small, but important, step forward after multiple messy quarters* and shares down >50% over the last three months."

- "*Importantly, management reiterated it's on track to hit 20% MVF utilization by the end of F2024, and $100M in revenue by C4Q24 —an important proof point for investors who were skeptical of a meaningful revenue ramp*."

- "We (and investors) continue to see Wolfspeed's ability to ramp sufficient 200mm wafer capacity to service its MVF facility *as the critical hurdle to the story*. Management reiterated it is on track to hit its 20% utilization goal at the facility in F4Q (Jun), and realize ~$100M/quarter two quarters later, with enough qualified products to hit these targets….. *Overall, after a number of messy quarters, we welcome a comparatively quiet call with output heading in the right direction*."

- "Amidst negative EV headlines, we remain firm believers in silicon carbide's technical benefits, the market opportunity enabled by xEVs (see our deep-dive here), and our view that substrate capacity keeps the market constrained for at least several years."

123.    An October 31, 2023, William Blair report stated, "Wolfspeed executed. *Shares are up 12% after a quarter of doing what the company said it would do*. Wolfspeed is making progress ramping up Mohawk Valley, Building 10 is on track to supply up to 20% utilization…"

124.    An October 31, 2023, J.P. Morgan report stated, "*we believe investor focus will be on the increased confidence expressed by the management team relative to the ramp for the Mohawk Valley Fab (MVF), which has been the keystone to the bull thesis on the shares, and has been overshadowed in recent quarters by execution mishaps*."

125.    An October 31, 2023, BNP Paribas report similarly stated, "With no new surprises *key takeaway from the mixed results and guide was MVF ramp-up remains on-track to hit 20%* utilization in Jun-Q C24 and $100m revenue in Dec-Q CY24. Despite what we heard from peers xEV demand remains strong while Industrial energy demand in China has softened."

126.    An October 31, 2023, Morgan Stanley report stated, "*All roads lead to Mohawk Valley*. The most important milestone for the company in the next 9 months is the Mohawk Valley ramp, and *the company made 2 updates that support the case for 20% utilization by end-FY24*."

127.    An October 30, 2023, Oppenheimer & Co Inc. report stated, "WOLF anticipates meeting target utilization of 20% by F4Q24" and that management "suggest[ed] the SiC market appeared under-supplied for a half decade."

128.    An October 30, 2023, Piper Sandler report stated, "Management reaffirmed that they are expecting the fab to reach 20% utilization by the June quarter" and "We believe that the ramp to $100 million of revenue run rate by next December timeframe is largely on track. Overall, we are pleased with the larger progress across facilities and increasing contribution from MVF. WOLF also noted that most of its EV business remains exceptionally strong and management has not seen any weakness in any aspects of power devices relating to automotive."

129.    On January 31, 2024, the Company reported its second quarter results for fiscal year 2024.  During the corresponding earnings call, Defendants again detailed the importance of

MVF's ramp to the Company's success with Lowe reminding investors "***We've said time and time again that all roads lead to Mohawk Valley***."

130.    Thereafter, Lowe again asserted that the operational problems that had delayed the MVF ramp prior to the Class Period were behind the Company and that demand would outstrip the Company's supply for years to come:

> ***The Mohawk Valley Fab*** delivered improved performance and ***is on track to achieve 20% utilization in the June quarter***. From a 200-millimeter substrate perspective, there is now ample runway to not only meet but exceed our original utilization target from Building 10 on the Durham campus as we're consistently producing high-quality, high-yielding 200-millimeter wafers out of this facility. The additional flexibility will be important as we begin producing substrates in the latter half of this year at The JP. Overall, ***I'm confident about our execution of our near-term operational goals and optimistic around our long-term financial prospects***.

***

> ***To give you a sense for the progress at Mohawk Valley, so far***, we've qualified over a dozen customer parts, including 2 of our most complicated automotive devices, as well as the largest device we are currently producing at the facility. ***This gives us more than enough qualified parts to achieve our 20% utilization goal, and we expect to continue to qualify more parts between now and the end of June, further supporting the Mohawk Valley revenue ramp***.

***

> We achieved $2.1 billion in design-ins this quarter, marking our third highest quarter on record, ***which clearly indicates continuing and growing robust demand for silicon carbide***.
>
> ***More importantly, we posted a record of $2.9 billion of design-wins, which were heavily weighted towards EVs and included 28 different electric vehicle models. This diverse customer base across the global electric vehicle industry, with multiple OEMs and Tier 1s, gives us confidence to continue with our expansion plan and further illustrates why we believe our supply will be continuing to work to catch up with demand over the next few years. And these design-wins are just the beginning***.

***

*We are working closely across a diverse set of customers, which gives us good visibility into how the markets are evolving and where we can capitalize on the opportunity*. Being the leader in silicon carbide, a truly transformative technology, is no easy task. And we are executing on this opportunity with efficiency, purposefulness and thoughtfulness. We look forward to bringing this vision into reality and generating long-term value for all stakeholders.

131.    Defendants' statements referenced in ¶130 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; and (iv) Defendants did not have a reasonable basis for projections and guidance provided to the market.

132.    Lowe stated that he had personal knowledge about the progress of the ramp at MVF because "I spent a lot of time at Mohawk Valley this past quarter and witnessed the dedication of our team firsthand."

133.    The question-and-answer segment of the call followed, during which analysts noted the surprising certainty with which Defendants were speaking about the ramp given the Company's past operational issues that delayed the ramp. For example, an analyst from Goldman Sachs Group, Inc. stated, "it sounds like the tone, the confidence, some of the data points you're throwing out there, Gregg, are as positive-sounding as we heard about the internal operationals [*sic*]" and "What is the potential for Mohawk to maybe pull ahead in the ramp to 20%? I know you're super confident in being able to hit it." In response to the analyst's question, "Are there still internal bottlenecks operationally keeping you from accelerating?," Lowe stated:

So first off, the team has done -- the team up in Mohawk Valley combined with several -- the teams from Durham that have gone up to Mohawk Valley, has done an incredible job of relieving bottlenecks and fine-tuning the processes, et cetera.

32

So very pleased with the progress we're making, still have a lot to do. But obviously, tripling the revenue and then doubling it again next quarter is fantastic. *We feel great about where we're at with Building 10, obviously, now having an ability to support a greater ramp of 25% is fantastic as well*.

*But as I said in the prepared remarks, we're going to keep the pace of the fab itself at the pace of 20% utilization in the June quarter, $100 million of revenue in the December quarter. We feel real good about that*. But again, from a longterm perspective, the ability to get more out of the facilities on the Durham campus in terms of supplying Mohawk Valley, *it gives us really good confidence in being able to take that number up higher out in time*.

134. In response to a question from an analyst at JPMorgan Chase & Co concerning the Company's purported "robust" EV design-in pipeline, Lowe stated:

So this past quarter, we had a record conversion of $2.9 billion to design-win that represented, as I mentioned, there's 28 different unique electric vehicle models that are in there and a whole bunch of other products as well, including a number of industrial and energy applications. *So we're really happy and very -- quite frankly, the design-win conversion we just had is quite a stunning number of $2.9 billion. So I feel real good about that conversion. And then the $2.1 billion of design-in gives us confidence that customers are still very excited about our technology and our capability*.

135. A William Blair & Company LLC analyst expressed concern that it appeared that the Company had excess inventory piling up at MVF, stating, "if I look at what Building 10 is outputting in terms of wafer starts and what you're pulling down on that in Mohawk Valley, my calculation would be that you will have an inventory of wafers over $200 million by June." In response, Lowe told the analyst that the excess inventory was "actually good news," stating, "*So you're exactly right that we are shipping out of the Durham facilities up to Mohawk Valley and obviously, we have inventory building up there in anticipation of the ramp. So no question about that as we're trying to get ahead of things. So that's actually good news*."

136. Following on Lowe's assertions, Reynolds stated:

[W]hat that means that there's no real change to the outlook right now. *The key driver here, as we have talked about, is just ramping the revenue to $100 million by December quarter coming out of Mohawk Valley*. And clearly, the inventory

that we see coming out of Durham and Building 10 gives us good strength and good confidence that we'll have an available number of substrates to go drive that revenue through. So it will really be about how quickly can we get that throughput through the fab and out to customers over that period.

Now one other thing I'll mention is we also mentioned on the call here is we should be able to see Durham go from 20% to 25% equivalent utilization by December or towards the end of the year. So what that means is *we'll be able to go above the $100 million a quarter as you get out into kind of that March, June 2025 time frame*. So -- and then when The JP starts making meaningful substrate deliveries to Mohawk Valley, probably in the back half of calendar '25, we should have a nice glide path of substrates to support us out through that period. *So we feel like, obviously, the demand continues to remain strong based on the customers that we have in front of us and it really just be about ramping, delivering substrates to the fab and continuing to drive productivity and output there*.

137.    Defendants' statements referenced in ¶¶133-136 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; and (iv) Defendants did not have a reasonable basis for projections and guidance provided to the market.

138.    Analysts were universally positive about Defendants' reassurances that the ramp of MVF was still not experiencing any delays toward 20% utilization. For example, a January 31, 2024, Piper Sandler report stated, "In our opinion, *the key metric associated with WOLF's performance is the ramp of MVF… All in all, we are pleased that MVF is finally ramping well and has a line of sight to what appears to be a comfortable ramp to $100M per quarter by the promised December 2024 timeframe*." The report further stated, "Management reaffirmed that they are expecting the fab to reach 20% utilization by the June quarter. On end demand, WOLF cited weakness out of the industrial and energy markets with particular weakness in China and

greater Asia… Ultimately, the company expects that MVF will reach $100 million in revenues in December as the fab reaches the target of 20% utilization in June of 2024."

139.    Similarly, a January 31, 2024, Wells Fargo report stated, "*what's important is that WOLF is bringing up its Mohawk Valley operation from $12MM in rev in the 4Q-CY23 to $100MM in 4Q-CY24*. All roads lead to Mohawk." And a January 31, 2024, JP Morgan report stated, "*there were bright spots for investors to get excited about, including: 1) Mohawk Valley Fab (MVF) ramp remains on track*, ramping to revenue of $12 mn in F2Q24 (vs. outlook of $10-$15 mn) and is guided to reach $20-$30 mn in F3Q24 and $100 mn in F2Q25."

140.    Analysts were similarly encouraged by Defendants' statements that EV demand remained strong. For example, a February 1, 2024 Canaccord Genuity Capital Markets report stated, "*the big stuff is starting to happen. Mohawk Valley is ramping nicely*, 200mm crystals are showing "excellent quality", *and EV demand remains strong despite all the industry hullabaloo.*"

141.    On March 4, 2024, Wolfspeed presented at Morgan Stanley's Technology, Media & Telecom Conference 2024. In response to the moderator's question, "And the bottom line here is you're quite confident hitting the milestones for Mohawk Valley for the rest of the year?" Lowe responded point-blank "*Yes, yes I am*."

142.    Similarly, in response to the moderator's question about the Company's demand, Lowe stated:

> We sort of have a funnel, so to speak, taking the opportunity that we have, the design ins that we have, the design wins that we have and then what the revenue is going to be. And at each of those stages, we take a pretty decent haircut just anticipating that the customer might not make 1 million cars, maybe it's going to be 500,000, or they're taking a brand from a run rate of 100,000 cars to 500,000 cars, and is that really viable. So we take haircuts on that sort of stuff.

We do the same thing with our China customers. We have great customers in China, where we've got pretty decent exposure to the auto industry there. But it's sort of in the country's interest to try to foster internal capabilities. So we make an assumption that more of that is going to possibly go away. ***Despite taking all of those sort of judgments, we still have a demand scenario that is substantially higher than our supply for the foreseeable future***.

143.     In response to the moderator's question about possible shifts in the market between EV and internal combustion vehicles, Lowe stated, "***First off, it's not going to matter to us because the supply is not meeting the demand right now, so we'll just be able to shift it. There might be a quarter where we're running with this one part and we need to shift it to a different part. We have a lot of fungibility though, so we probably are not going to see that***." He then concluded his response by stating, "***Yes. It's going to be highly disruptive. Winners, losers. Forecasts are going to be changing. It doesn't really matter to us for the foreseeable future***."

144.     Defendants' statements referenced in ¶¶141-143 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; (iv) the declining demand and inventory buildup required the Company to significantly decrease prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market.

145.     On May 1, 2024, Wolfspeed reported its results for the third quarter of fiscal year 2024.  In the corresponding earnings call, Lowe complained "***we believe the market is not fairly valuing the company***, consistent with the technology and the business we have built or the strategic potential of the business" and asserted "driving better financial performance and value for shareholders by delivering on our near-term operational commitments for fiscal 2024 and 2025 is

at the core of every decision we make. We are laser-focused on increasing the utilization at Mohawk Valley"

146.    Thereafter, Lowe asserted, "***We are on track to achieve 20% wafer start utilization in Mohawk Valley by June of this year***. And to give you a sense of the progress we're making ***as of April, we are already at more than 16% utilization based on wafer starts per week, making us extremely confident on our ability to achieve our target in June of 2024***."

147.    On the issue of demand, Lowe distinguished the purported strong and increasing strong demand for EV from the weaker demand in the industrial and energy market:

> While Mohawk Valley, which currently services almost entirely EV customers, is something the I&E market or industrial and energy market remains challenged and remains weaker than our original expectations, primarily due to inventory buildups across many end market channels predominantly in the Asian markets.
>
> ***We are responding by shifting I&E capacity both in Durham and Mohawk Valley towards EV. Our ability to shift our production from I&E to EV speaks to the flexibility that our business model provides us***. However, this end market shift and change in product mix will have a short-term headwind on our gross margins, but it will position us well for fiscal 2025, as we could see the start of a recovery for the I&E demand at some point during this period.
>
> ***Unlike I&E, we continue to see a ramp of EVs that have adopted our silicon carbide devices.*** While this is a disruptive time in industry, and we continue to see OEMs adjusting and modifying their near-term EV production plans, ***we remain substantially supply constrained for our silicon carbide devices. As demand remains well above our current supply, we can be nimble and shift much of our supply to other customers to accommodate for these near-term changes***.
>
> ***Underscoring this continued EV demand is our strong design-in and design-win performance this quarter.*** As a reminder, a design-in represents business we've been awarded which converts to a design-win once we begin ramping into initial production. This quarter, we achieved approximately $2.8 billion of design-ins, about 80% of which was for EV applications, marking our second highest total on record and totaling over $7 billion of design-ins for fiscal 2024.

***

In the short term, *we are pivoting our available capacity to EV products, where EV product demand continues to outstrip our available capacity to serve that demand*.

148.    On the issue of inventory, Lowe stated, "We believe that it will be at least the second half of this calendar year before we see inventory levels return to normal. But as we said last quarter, *much of the product we had already produced and slated to ship at the match elsewhere in our pipeline*. And we are continuing to work to find the best match for that inventory now."

149.    In response to a question from a William Blair & Company LLC analyst who observed, "your comments on demand, which seems strong for you in EV," Reynolds stated, "So in terms of the -- how we think about that right now, the end market demand for automotive in terms of EV customers. So there's a lot of changes that Gregg talked about in terms of the OEM landscape. *The amount of demand still outstrips our supply*. So it's really important for us to continue to take as much capacity as we can serve those customers."

150.    In response to the analyst's follow-up question, Lowe stated, "*Obviously, we have automotive demand that is higher than our current supply.* So transitioning that capability from I&E to automotive is a very important customer satisfaction item that we're focused on."

151.    Defendants' statements referenced in ¶¶146-150 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; (iv) the declining demand and inventory buildup

required the Company to significantly decrease prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market.

152.    Investors were misled by Defendants' statements as demonstrated by the analyst reports issued following the earnings call. For example, a May 1, 2024 Piper Sandler report stated, (i) "*The most important part of the call in our view was that commentary around the ramp at the Mohawk Valley Fab was largely positive and the company is tracking well towards its 20% utilization target for June*;" (ii) "Management reaffirmed that they are expecting the fab to reach 20% utilization by the June quarter and it is currently at 16% today;" and (iii) "Ultimately, WOLF still expects that MVF will reach 20% utilization in June of 2024 and thus produce $100 million in revenues in the December 2024 quarter."

153.    A May 1, 2024, Canaccord Genuity Capital Markets report stated, (i) "*Mohawk Valley is ramping well. The materials business is humming. EV demand/ pipeline is strong despite a wobbly end market*;" (ii) "MHV is ramping well. Management continues to make progress on the MHV ramp: in April, Wolfspeed achieved >16% wafer start utilization. Given this achievement, management is confident their 20% MHV utilization by June target is achievable. According to management;" and (iii) EV healthy. Despite an avalanche of data points that suggest weakness throughout the EV ecosystem, Wolfspeed continued to experience a ramp in EV SiC device adoption…According to management, EV device demand continues to outstrip supply…*Wolfspeed's backlog of design-wins supports more than 125 EV models across 30 OEMs throughout the next 3-5 years*."

154.    On May 20, 2024, Wolfspeed presented at JPMorgan Global Technology, Media and Communications Conference 2024.  In response to the moderator's question "Just walk us

through what you're seeing from customers in the EV market? How would you characterize the EV market demand outlook right now…?, Lowe responded:

> Well, I'll start by saying we've actually won a pretty substantial amount of business over the last 5 years. And a lot of that is just in the early phase of transitioning to going into production. From an EV perspective, we've got, I think, 120 different car models from 30 different OEMs going into production over the next couple of years. *So the talk about a slowing of existing EVs is not what we're in right now*.
>
> *We remain capacity limited. The demand for our product is higher than the capacity we have. And the adoption of silicon carbide has also been substantially higher than we originally anticipated*.
>
> ***
>
> And the last point I'd make is, just yesterday, Sunday, 1 p.m. I had a customer call, looking for more product this year, more product next year, more product in 2026. *So an increasing demand*.

155.    Later during the conference, Lowe repeated, "*we remain in a situation where the demand for the silicon carbide chips from us remains ahead of what our supply is*" and "*the demand for silicon carbide is higher than the supply*."

156.    Defendants' statements referenced in ¶¶154-155 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; (iv) the declining demand and inventory buildup required the Company to significantly decreases prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market.

## VIII. THE TRUTH BEGINS TO EMERGE AS DEFENDANTS CONTINUE TO MISLEAD THE MARKET

157. On June 20, 2024, *Reuters* published an article entitled "Wolfspeed plant delayed as EU's chipmaking plans flounder." The *Reuters* article stated, in relevant part:

Wolfspeed [. . .] has delayed plans to build a $3 billion plant in Germany, highlighting the European Union's struggle to increase semiconductor production and reduce its reliance on Asian chips.

The planned plant in the state of Saarland, which would make computer chips used in electric cars, has not been scrapped entirely and the company is still seeking funding, a spokesperson said.

But, ***having cut capital spending following weakness in the European and U.S. EV markets***, North Carolina-based Wolfspeed is now focused on ramping up production in New York, the spokesperson added. The company won't start construction in Germany until mid-2025 at the earliest, two years later than its original target.

Wolfspeed has been under pressure from an activist investor to improve shareholder value after its stocks fell around 51% over the past year.

158. The June 20, 2024, disclosure partially revealed that demand for Wolfspeed's products as well as the Company's current and future financial condition and growth prospects may not have been as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

159. Following the publication of the *Reuters* article, Wolfspeed's stock price fell $2.24 per share, or 8.62%, to close at $23.76 per share on June 20, 2024.

160. Despite this decline in the Company's stock price, Wolfspeed securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions.

161. For example, on June 24, 2024, Wolfspeed announced that the "***Mohawk Valley silicon carbide fab has reached 20% wafer start utilization, a critical step in the Company's efforts to meet the growing demand for silicon carbide power devices.***" In the press release, Lowe

41

stated, "***Having reached our 20% utilization target at Mohawk Valley, we are well-positioned to continue executing our 200mm vertical integration strategy ahead of other market participants***."

162.    The Company additionally announced that its "Building 10 Materials facility [at Durham] has achieved its 200mm wafer production target ***to support approximately 25% wafer start utilization at the Mohawk Valley fab by the end of calendar year 2024***."

163.    Defendants' statements referenced in ¶¶161-162 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; (iv) the declining demand and inventory buildup required the Company to significantly decrease prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market. Specifically, in regard to Wolfspeed's June 24, 2024, announcement that MVF was operating at 20% utilization, FE1 stated, "I never saw that number." "I never saw anything with that 20% on it internally." FE1 said, "It wasn't 20% utilization…It wasn't 20% of capacity, which was what the original target was." To the contrary, FE1 stated that when he left the Company in September 2024, MVF's utilization rate was "only at like 10%." FE1 said "there was a lot of pressure on the local team in New York" about not hitting the 20% utilization rate.

164.    Asked what he made of Wolfspeed's June 24, 2024, announcement that MVF had reached a 20% utilization rate, FE1 said he thinks Wolfspeed changed the definition of utilization so it could "get that number." "You can play with words," he said in regard to the Company's announcement.  However, "from a P&L perspective, it wasn't 20% utilization," he said. "It wasn't

20% of capacity, which was what the original target was." Asked how he thinks Wolfspeed defined the 20% utilization for purposes of the June 24, 2024, announcement, FE1 said it was not based on P&L and absorption dollars or capacity. It wasn't "straight capacity versus actual production, which I think is what most people – that's how they would assume utilization is being calculated." FE1 said it was possible Wolfspeed was referring to 20% of what was capable at that time. "The problem," he said, is that "capabilities weren't at the level" the Company needed them to be at. "I don't think that was their original intention behind the 20% target," he said, referring to a calculation based on capability. Asked if Wolfspeed was in effect moving the goalposts in, FE1 said, "I think so."

165.    On August 21, 2024, after the market closed, the Company announced its fourth quarter fiscal year 2024 results and had an associated earnings call. The Company reported adjusted quarterly losses of 89 cents per share, higher than analyst's expectations, and revenue fell to $200.7 million for the quarter, lower than analyst's expectations. During the call, the Company reported plans to close its production facility in Durham, N.C., as the Company tries to cut costs.

166.    The August 21, 2024, disclosure partially revealed that demand for Wolfspeed's products as well as the Company's current and future financial condition and growth prospects may not have been as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

167.    Wolfspeed stock opened on August 22, 2024 at a price of $13.76 per share and dropped to $12.83 per share to close on August 22, 2024, a decline of around $0.93 and around 6.76% in the span of one day.

168.    As the market continued to process this news, the stock dropped during the period of August 26, 2024 to September 03, 2024. The market opened on August 26, 2024 at a price of

$13.82 per share, and steadily dropped in the next several days to $9.11 per share to close on September 3, 2024, a decline of $4.86 and around 34.78%.

169.    Defendants continued to make false and misleading statements during the August 21, 2024, earnings call. During the call, Lowe once again proclaimed that "***the market is clearly not valuing the company consistent with our technology, the business we've built or the strategic potential of the business***."

170.    Lowe then stated:

Crystal growth and substrate processing out of Building 10 in Durham continues to scale, and ***we expect to be able to support a 25% wafer start utilization at Mohawk Valley in the September quarter***, 1 quarter ahead of plan. As a result of continued productivity improvements, ***we are also now expecting Building 10 to support 30% wafer start utilization at Mohawk Valley in the March quarter of 2025***.

\*\*\*

***Our revenue in the EV market continues to be strong because we are just at the beginning of the ramp of our automotive business across several geographies***.

Our EV revenue in the fourth quarter was up more than 100% year-over-year and is expected to be up approximately 300% year-on-year in fiscal Q1. We are in the very early stages of what might be the most significant transition in the history of the auto industry. This will create a very dynamic environment as the OEMs will continue to adjust their ramp programs across their EV product portfolio.

***Our EV revenue has grown for 3 consecutive quarters despite a declining auto semiconductor market because some of the EV design-ins we've accumulated over the last 5 to 7 years are just beginning to ramp. We achieved an additional $2 billion in design-ins in fiscal Q4, bringing our fiscal 2024 total to over $9 billion of design-ins***.

\*\*\*

Moving on to our guidance for the first quarter of fiscal 2025. We target our revenue to be in the range of $185 million to $215 million. ***We target roughly $50 million to $60 million of this revenue to come from Mohawk Valley next quarter***, up more than 34% from the prior quarter and up greater than $50 million year-over-year at the midpoint of our range versus the $4 million we achieved last year at this time.

171.    The question-and-answer portion of the call followed where Defendants clarified their plan to shutter the Durham fabrication facility and their confidence in absorbing that revenue through the Mohawk Valley facility, with Lowe stating, "*[O]utput from Building 10 now able to support 30% wafer start utilization; yields in Mohawk Valley ahead of plan; the economics of Mohawk Valley substantially more compelling than Durham.*"

172.    Reynolds similarly stated:

*So I think it's a real testament to the amount of revenue we can absorb through Mohawk Valley when you start making that trade from 150-millimeter to 200-millimeters. So I think here, in the medium term, if we go down that path, I think Mohawk Valley will have significant capability to absorb a lot of that revenue*. And of course, the trade-off from industrial and energy from 150 to 200 is actually a very, very good mix shift from that perspective.

*So we believe that the Mohawk Valley fab will really be able to incorporate a lot of that revenue just mentioned*, and we'll -- as we tighten up these plans and give more of an update, we'll let you know how that impacts the long-term model, *but we're clearly bullish on the ability of Mohawk Valley to absorb that*.

173.    In response to a question from a Morgan Stanley analyst concerning EV revenue growth and demand, Reynolds stated:

So on the EV revenue, as you said, EV revenue was up 2x in the quarter, 3x year-over-year in the outlook for the September quarter. *It's also gone, by the way, from representing about 25% of our power device revenue a year ago to over 50%, even the mid-50% of our power device revenue here in June. And if you look here in the September quarter, more than 60% of our power device outlook. So we expect that to grow even further as the year goes on*.

*So while we've seen some moderation, I would say, the overall EV growth rates, this has been well documented and reported and supply and demand are more matched up, we do continue to see some significant growth into the December quarter and into the first half of calendar year 2025*.

174.    Defendants' statements referenced in ¶¶169-172 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10%

during the Class Period; (iii) by January 2024 demand for and sales of the Company's products, including from the EV market, had plummeted; (iv) the declining demand and inventory buildup required the Company to significantly decrease prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market. Specifically, in regard to Wolfspeed's announcement that MVF was operating at 20% utilization, FE1 said, FE1 stated, "I never saw that number." "I never saw anything with that 20% on it internally." FE1 said, "It wasn't 20% utilization…It wasn't 20% of capacity, which was what the original target was." To the contrary, FE1 stated that when he left the Company in September 2024, MVF's utilization rate was "only at like 10%."

175.    Analysts again met Defendants' statements with positive responses. For example, an August 22, 2024, Roth Capital Partners, LLC report stated, (i) "***EV Growth Remains Real w Chunky Backlogs***;" and (ii) "***MVF is now slated to reach 25% utilization a quarter ahead of plan.***"

176.    An August 21, 2024, Oppenheimer report stated, "The fab achieved 20% utilization in June and is on track to achieve 25% utilization by September (ahead of schedule), with F1Q25 revenues from the fab guided between $50-60M. Management expects utilization to reach 30% by March 2025."

177.    On September 4, 2024, Wolfspeed presented at Citi's 2024 Global TMT Conference. During the question-and-answer presentation, Defendants again pertinently addressed Mohawk Valley's purported success and continued ramp while speaking to Wolfspeed's poor stock performance throughout calendar 2024. A Citigroup Inc. analyst asked "why do you think your stock price has underperformed by so much this year? What are the investors missing?" In response, Lowe emphasized that "getting the operations [at MVF] in better shape" has "been a

very, very key focus of me. I've been in Mohawk Valley. I've been in our materials factories pretty consistently during this time. And I think one thing that I think is -- not one thing, but several things have happened":

> Number one, Mohawk Valley has now turned into a very good asset for us in terms of production quality, yield, et cetera. Feeding Mohawk Valley out of Building 10 has also substantially increased. ***We announced that we hit 20% utilization in Mohawk Valley and that's because Building 10 was able to deliver the material to them. And we also announced on our last earnings call that Building 10 will actually be able to support a 30% utilization in Mohawk Valley, which is a 50% increase off the same number of growers***. So which -- maybe it's not that obvious, but that means our yield out of those growers is 50% better than anticipated. ***The yields in Mohawk Valley are now ahead of where we intended -- not intended, where we expected them to be at this point, and we still have quite a ways to go to get to what we call entitlement yield***.

> *** 

> ***So I think there's -- for the last 2 years, there's been a question of, can we get 200- millimeter going? And I think that answer has been -- that question has been answered pretty substantially***.

178.    In response to an analyst's question, "How should investors think about risk on utilization ramp like, for example, going from 0% to 20% versus 20% to, let's say, 60%?" Lowe stated:

> ***So in terms of the things you need to deal with, 0% to 20% is a lot harder than 20% to 40%***. There's no question about it, especially if it's never been done before. And that's what we faced. So all of those machines, as I said, we're seeing silicon carbide for the first time. ***So we anticipate that it will be a smoother ramp from 20% to 40%. And again, we're in the process of improving yields, improving cycle time. So I think we'll -- I think it will be a good -- I think we've got a good plan***.

179.    Defendants' statements referenced in ¶¶177-178 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Wolfspeed was slow to getting MVF up and running and MVF was not achieving the targeted volume quickly enough; (ii) MVF never achieved a monthly or quarterly utilization above 10% during the Class Period; (iii) by early 2024 demand for and sales of the Company's products,

including from the EV market, had plummeted; (iv) the declining demand and inventory buildup required the Company to significantly decrease prices; and (v) Defendants did not have a reasonable basis for projections and guidance provided to the market. Specifically, in regard to Wolfspeed's June 24, 2024, announcement that MVF was operating at 20% utilization, FE1 said, FE1 stated, "I never saw that number." "I never saw anything with that 20% on it internally." FE1 said, "It wasn't 20% utilization…It wasn't 20% of capacity, which was what the original target was." To the contrary, FE1 stated that when he left the Company in September 2024, MVF's utilization rate was "only at like 10%."

180.    On November 6, 2024, after the market closed, Wolfspeed released its first quarter results for fiscal year 2025, reporting consolidated revenue of approximately $195 million, of which MVF contributed approximately $49 million in revenue. For its second quarter of fiscal 2025, Wolfspeed targeted revenue from continuing operations in a range of $160 million to $200 million, a midpoint of $180 million, well below analysts' estimate of $214.7 million.

181.    Defendants conducted an earnings call to discuss the reported results, the reported slowdown in EV demand, and reduced guidance. During the call, CEO Lowe acknowledged that the revenue from MVF was "lower than originally anticipated due to market demand and customer pushouts" and he reduced the guidance for revenues from MVF to the range of $50-70 million.  In pertinent part, Lowe identified "*the slower growth of EVs adoption*" and "*EV customers revis[ing] their launch time lines as the market works through this transition period*" as reasons for the poor results and lower guidance, as well as for certain steps that the Company was taking. Lowe stated:

> These steps include: *first, we have begun to execute our plan to close our 150-millimeter device fab on the Durham campus*. This closure will be a phased process over the next 9 to 12 months, and we are currently working with customers to finalize the transition time frame.

***Second, we are optimizing our capacity footprint by closing our epitaxy facility in Farmers Branch, Texas and indefinitely suspending our construction plans for the next device fab in Saarland, Germany***. We expect to ramp down final production in Farmers Branch by the end of this calendar year.

***Regarding Saarland, we have spoken with government officials and Zeta and they understand that we would need to see a clear acceleration of our customer demand and additional capacity requirements before we would reconsider construction at the site***. While we are indefinitely suspending our activities in Saarland at this time, should we determine to build a fab in the future, the in-store site remains our preferred site in Europe.

***Third, we have implemented a workforce reduction in our administrative and other business functions. This reduction, along with the factory closures, will impact approximately 20% of our total employee base. This reduction will better align our business with current market conditions and customer demand***. These facility and head count restructuring initiatives are targeted to generate annual cash savings of approximately $200 million, significantly improving our projected cash flow from operations over time. These actions will foster a stronger, more agile company, ready to seize the opportunities ahead. Many of these reductions have already occurred, and we expect to complete the majority of the actions by the end of the year.

And lastly, we are further reducing our fiscal 2025 CapEx guidance range by an additional $100 million to a new range of $1.1 billion to $1.3 billion, excluding federal incentives. This reduction will align the pace of our CapEx spend with the broader shift in EV and I&E market demand that we are currently observing.

182.     CFO Reynolds further elaborated on the financial details of lower demand and the

plan to cut costs to match such reduced demand, stating, in pertinent part, as follows:

\*\*\*

Now moving on to our quarterly results. We generated $195 million of revenue for the quarter, slightly below the midpoint of our guidance and down 3% sequentially. We recognized power revenue of $97 million, down quarter-over-quarter, driven largely by lower demand in the industrial and energy sectors. ***Revenue contribution from Mohawk Valley was $49 million, up more than 20% quarter-over-quarter but at the lower end of our range due to lower customer demand within the quarter.***

\*\*\*

Finally, turning to our Q2 2025 guidance. *We target Q2 2025 revenue to be between $160 million to $200 million, reflecting the current macro environment and our demand visibility related to EVs*. We continue to have ongoing customer demand discussions that we expect to provide more clarity for calendar 2025 as we complete the quarter. *The rights revenue at Mohawk Valley is targeted to be between $50 million to $70 million for Q2*.

183.    Addressing the MVF utilization, Reynolds stated "*we will reduce utilization this quarter to target an inventory burn* as well as complete the scheduled maintenance shutdowns I just mentioned."

184.    A question-and-answer segment followed the Defendants' prepared remarks, during which Defendants discussed the potential lost revenue caused by shuttering the Durham facility. In pertinent part, in response to a JPMorgan Chase & Co. analyst's question, "And as you talk to customers around transitioning the capacity that you're currently running out of Durham to Mohawk, what's your sense on the appetite to transition this capacity versus perhaps customers potentially being more reluctant to do so?," Lowe stated:

> *Obviously, anytime you transition from one fab to another, the customers have an input into that, we're engaged with them… I think we're transitioning the vast majority of the revenue up to the factory. There will be some parts that don't transfer, but the vast enough amount of revenue is planning to transfer to Mohawk Valley*.

185.    The November 6, 2024, disclosure revealed that demand for Wolfspeed's products, operations at MVF, as well as the Company's current and future financial condition and growth prospects were not as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

186.    Investors and analysts reacted immediately to Wolfspeed's revelation. The price of Wolfspeed's common stock declined dramatically. From a closing market price of $13.71 per share on November 6, 2024, Wolfspeed's stock price fell to $8.33 per share on November 7, 2024, a decline of 39.24% in the span of just a single day.

187.    Analysts similarly were shocked by the revelations concerning the drop in EV demand, the stalled ramp of MVF, and the impact on the Company's current and future operations as a result. For example, a William Blair reported stated that "the outlook once again is well below expectations . . . ***The lack of operational progress is likely to weigh on the shares, creating a natural overhang in a name where management has lost credibility***."  The analyst went on to observe that "***Mohawk Valley has stalled in the rate of growth; by our estimate Wolfspeed is now over 30 months behind schedule***. The analyst further recognized, "if the headwinds are demand related, how valuable are the design-in and design-wins?"

188.    Similarly, JPMorgan highlighted that Wolfspeed "management's disclosures of a worsening demand backdrop relative to EV and I&E Power Devices as well as Materials is now likely ***to diminish the confidence around stabilization that was starting to build with investors***," and "we believe the combination of a sluggish demand backdrop across EVs and I&E, which appears to have moderated further, with a long road of execution still ahead of the company, and many moving pieces to secure the full extent of funding available as part of CHIPS Act will delay improvement in investor appetite."

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER

189.    Numerous facts alleged herein support a strong inference that Defendants knew or recklessly disregarded that the statements set forth above were materially false and misleading when made.  The below facts further support the inference of scienter as to each defendant.  The scienter of the Individual Defendants and other senior executives is properly imputed to Wolfspeed.

A.    **The Critical Importance of the MVF Ramp and the Company's Supply to Meet Demand Supports a Strong Inference of Scienter**

190.    As alleged above, prior to the start of the Class Period, Wolfspeed's Durham, N.C. facility was operating at 100% capacity, which meant that Wolfspeed did not have the ability to supply the high demand in the market at the time. Therefore, any growth for the Company would depend on a successful and speedy MVF ramp without delays. As Defendants admitted and analysts repeatedly stated, these were by far the most important issues for the Company. Defendants discussed in detail the MVF ramp as well as demand for its products during every call with investors. Moreover, they routinely admitted that these issues were of critical importance to the Company.

191.    For example, during the January 25, 2023, earnings call, Lowe stated that demand was "overwhelming" and "rapidly growing," and Reynolds stated,

> [W]e're continuing to see very, very strong demand across both power devices and materials. And as we previously discussed, for both of those areas, that's going to be much more of a supply situation rather than it being a demand situation. ***So bringing on supply is really the critical focus there***.

192.    During the April 26, 2023, earnings call, Reynolds acknowledged that the Durham facility was running at full capacity and, therefore, "***our growth will be governed by how quickly we ramp 200-millimeter substrate capacity and, in turn, the Mohawk Valley fab…***"

193.    During the August 16, 2023, earnings call Reynolds again told investors, "***the main driver of future revenue growth for power devices will be the incremental revenue contribution from Mohawk Valley***."

194.    During the January 31, 2024, earnings call, Lowe reminding investors, "***We've said time and time again that all roads lead to Mohawk Valley***."

195.    During the call, Lowe also stated, "We achieved $2.1 billion in design-ins this quarter, marking our third highest quarter on record, ***which clearly indicates continuing and***

*growing robust demand for silicon carbide. **More importantly, we posted a record of $2.9 billion of design-wins, which were heavily weighted towards EVs.***" Lowe also proclaimed that he had specific knowledge and insight into the Company's demand, stating, "***We are working closely across a diverse set of customers, which gives us good visibility into how the markets are evolving and where we can capitalize on the opportunity***."

196.    During the same January 31, 2024, earnings call, Reynolds stated, "***The key driver here, as we have talked about, is just ramping the revenue to $100 million by December quarter coming out of Mohawk Valley***."

197.    On June 24, 2024, Wolfspeed announced that the "***Mohawk Valley silicon carbide fab has reached 20% wafer start utilization, a critical step in the Company's efforts to meet the growing demand for silicon carbide power devices.***"

198.    Analysts echoed Defendants' statements that a smooth ramp of MVF as well as the supply to demand ratio were the most important issues for the Company, and any delays in the ramp were met with investor backlash, as demonstrated by the following analyst reports:

- A January 25, 2023 Wells Fargo report stated, "While WOLF's 2Q23 results & 3Q23 guide were below prior views, we believe WOLF shares should be bought on any sell-off. ***What is important is that WOLF's SiC mkt footprint is expanding & MV is set to ramp in 2H FY23***."

- A January 26, 2023, JP Morgan report stated, "***More importantly***, with limited visibility in an RF recovery as well as Durham's Power Device revenue reaching capacity, ***the financial performance and the investment thesis has now become even more disproportionately weighted towards a successful ramp of MVF***."

- A January 26, 2023, William Blair report stated, "On the call, management acknowledged revenue from Mohawk Valley was pushed out a quarter, and now expects single-digit millions recognized in the fourth quarter. This is in line with our expectations that we laid out in our preview note. Although disappointing in the near term, ***our focus lies on the value of Mohawk Valley looking past the next two quarters***."

- An April 26, 2023, Piper Sandler report stated, "***probably the largest and most meaningful item in the earnings call was the delay in the ramp of the MVF facility***. The company expects that by the end of FY24 it will achieve 20% capacity utilization."

- An April 26, 2023, Wells Fargo report stated, "***Timing of Mohawk Valley Ramp is Key***."

- An April 26, 2023, BNP Paribas report stated, "***Main takeaway from conf-call is that after a 1 quarter pushout in FQ2, the co has now further pushed out the ramp-up of its MVF fab by another few quarters***."

- An April 27, 2023, Morgan Stanley report, discussing another delay in the ramp of MVF, stated, "***It is important that management resolves these issues***, as this seems like more than a transitory problem. FY24 guidance, for the first full year of Mohawk Valley, was the guidepost for much of the last 3 years, so ***to fall this far short is a blow to investor confidence***."

- An April 27, 2023, William Blair report stated, "***we believe this [reset] is the last one investors will stomach***."

- During the August 16, 2023, earnings call, an analyst from Piper Sandler  Co. prefaced a question with, "It's pretty clear that your future growth of the company lies with Mohawk Valley."

- An August 2, 2023, JPMorgan report stated, "***what we believe should be more of a focal point for investors, is that F4Q results were headwind free as it relates to ongoing ramps at Durham, MVF and now JP following multiple quarters of execution challenges and delays***."

- An August 16, 2023, Wells Fargo report stated, "***Timing of Mohawk Valley Ramp Remains Key***."

- An October 30, 2023, TD Cowen report stated, "***Importantly, management reiterated it's on track to hit 20% MVF utilization by the end of F2024, and $100M in revenue by C4Q24 —an important proof point for investors who were skeptical of a meaningful revenue ramp***."

- An October 31, 2023, J.P. Morgan report stated, "***we believe investor focus will be on the increased confidence expressed by the management team relative to the ramp for the Mohawk Valley Fab (MVF), which has been the keystone to the bull thesis on the shares, and has been overshadowed in recent quarters by execution mishaps***."

- An October 31, 2023, BNP Paribas report similarly stated, "With no new surprises ***key takeaway from the mixed results and guide was MVF ramp-up remains on-track to hit 20%*** utilization in Jun-Q C24 and $100m revenue in Dec-Q CY24."

- An October 31, 2023, Morgan Stanley report stated, "***All roads lead to Mohawk Valley***. The most important milestone for the company in the next 9 months is the Mohawk Valley ramp, and ***the company made 2 updates that support the case for 20% utilization by end-FY24***."

54

- A January 31, 2024, Piper Sandler report stated, "In our opinion, ***the key metric associated with WOLF's performance is the ramp of MVF***."

- A January 31, 2024, Wells Fargo report stated, "***what's important is that WOLF is bringing up its Mohawk Valley operation from $12MM in rev in the 4Q-CY23 to $100MM in 4Q-CY24***. All roads lead to Mohawk."

- A February 1, 2024 Canaccord Genuity Capital Markets report stated, "***the big stuff is starting to happen. Mohawk Valley is ramping nicely***, 200mm crystals are showing "excellent quality", ***and EV demand remains strong despite all the industry hullabaloo.***"

- A May 1, 2024 Piper Sandler report stated, (i) "***The most important part of the call in our view was that commentary around the ramp at the Mohawk Valley Fab was largely positive and the company is tracking well towards its 20% utilization target for June***."

199.    Defendants' numerous, detailed discussions with analysts and investors regarding the importance of the MVF ramp in light of the high demand for the Company's products are probative of Defendants' knowledge of those subjects and support a strong inference of scienter.

### B.    Defendants' Regular and Detailed Statements and Responses to Analyst Questions Concerning MVF Utilization and Demand Support a Strong Inference of Scienter

200.    Throughout the Class Period, Defendants regularly provided updates on, and were asked questions from analysts about, MVF utilization, the demand for Wolfspeed's products, and Wolfspeed's projections. As alleged above, Defendants did not demur or claim ignorance of these matters. Rather, Defendants repeatedly provided detailed answers to these questions, indicating their personal knowledge on the subjects. Indeed, Defendants repeatedly and expressly stated that they had personal knowledge of the issues. Defendants' detailed statements concerning such issues include, but are not limited to, the following:

- During the October 30, 2023, earnings call, Lowe stated, "demand remains high for our products, and ***customers' needs are higher than our current output levels***. And this is why ***we are keenly focused on ramping Mohawk Valley to 20% utilization***."

- During the October 30, 2023, earnings call, Lowe stated, "***As I mentioned [I] was in the fab last week. I will be in fab 2 more times in November, including on Thanksgiving Day to continue the focus of Mohawk Valley Ramp to 20% utilization***."

- During the same call, Lowe again stated, "*I am personally laser-focused on the Mohawk Valley ramp to 20% utilization in the June quarter.*"

- During the January 31, 2024, earnings call, Lowe stated that he had personal knowledge about the progress of the ramp at MVF because "*I spent a lot of time at Mohawk Valley this past quarter and witnessed the dedication of our team firsthand*."

- During the January 31, 2024, earnings call, Lowe also proclaimed that he had specific knowledge and insight into the Company's demand, stating, "*We are working closely across a diverse set of customers, which gives us good visibility into how the markets are evolving and where we can capitalize on the opportunity*."

- On September 4, 2024, Lowe emphasized that "*getting the operations [at MVF] in better shape*" has "*been a very, very key focus of me. I've been in Mohawk Valley. I've been in our materials factories pretty consistently during this time*."

201.    Defendants' specific statements admitting that they were keeping informed of the very subjects of their false and misleading statements supports a strong inference of scienter.

### C.    Defendants' Access to Information Concerning MVF Utilization and EV Demand Supports a Strong Inference of Scienter

202.    Based on the statements of the FEs, Defendants had access to information concerning MVF utilization and EV demand, and it would be illogical to assume that Defendants were unaware that their statements were false and misleading.

203.    FE1 had access to information about MVF's utilization because FE1 was responsible for reporting the "actual results" of MVF in the form of a monthly "financial review" or "P&L" review. The P&L reviews were maintained in Microsoft Excel spreadsheets and stored on a shared Microsoft OneDrive server. According to FE1, there was a tab for Companywide revenue and cost margin, along with separate tabs showing those figures for the Company's plants in North Carolina and New York, along with subcontractors in Asia.

204.    The monthly P&L reviews conducted in part by FE1 included information about MVF's utilization because if the facility was "not hitting" the "planned utilization," Wolfspeed would need to "carry a variance," which FE1 had to apply. FE1 also participated in a monthly call

about the P&L reviews with Senior Vice President, Finance Kevin Speirits and the Company's plant controllers and business unit controllers. During these calls, FE1 would "read[] out and explain[]" these results to Mr. Speiritis. FE1 "would have assumed" that Lowe and Reynolds received the P&L reviews.

205.    FE2 said demand began declining during FE2's first month at Wolfspeed in February 2024: "[T]he volume or the demand just fell off a cliff."

206.    Discussing the Company's falling demand and revenue, FE2 said he knew about these figures based on "what I saw coming in when looking at" the Company's P&L statements, including actual performance versus forecast. "If you can imagine a car driving off a cliff crashing into a ravine, that's basically what happened," FE2 said.

207.    FE1 likewise stated that Wolfspeed's projected revenue outlook and anticipated growth was unrealistic. FE1 knew this based on direct conversations FE1 had with the Company's Sales financial analysts and controllers, who communicated to him that the "Sales folks think" the Company had set an "unrealistic number." "In talking to the other analysts under the business units, they would say, 'The Sales team said this and that,'" he said. "The Sales team was getting frustrated," FE1 said; "they felt like they were signing up for a number they didn't have a clear path to."

208.    FE1 likewise confirmed that demand had plummeted by early 2024, stating that by June 2024, "you could feel the pressure" and "there was definitely a lot of panic setting in" because "sales were falling and falling quick" and "orders were falling quick," adding that there was a "significant drop-off in orders." This was true "across the board, in every business unit." FE1 said he knew this in part from seeing the Company's "final rollup," which included sales, margin and net income.

57

209.    According to FE2, Senior Director – Power Finance, Hunter Lane (who reported to Reynolds) and others were "constantly fighting" within the Company "to say, 'look something has to change,'" referring to "wafer cost and pricing decisions that needed to be made."

210.    FE2 said "there's no way" that senior leaders such as CEO Lowe and CFO Reynolds "couldn't have known" about the falling demand, given that "everyone was aware that there was an issue." FE2 reiterated that the declining demand was "definitely a problem that was talked about" generally throughout the Company, adding that "I brought it up on some occasions." "If they were unaware that the demand was on the floor at that level, I would genuinely be flabbergasted," FE2 said.

211.    FE2 said he and his colleagues sent weekly reports to the vice-president level of the Company with data on revenue, backlog, price, cost, facility performance and demand planning, which reflected the declining demand. "You know that last quarter you have X amount and this quarter you have 50% lower" in revenue, FE2 said, explaining how the reports would indicate declining revenue and demand. "I as an analyst with other teammates was creating the reports at Hunter Lane's request for reporting," FE2 said. The reports were "definitely sent to the chain" of employees "underneath" Lowe and Reynolds, including those at the Vice President and Director level, FE2 said.

212.    Additionally, FE2 said that Senior Demand Manager Matthew Bolick "would point to this crazy demand schedule that I never thought – there was no way they were going to achieve it," adding that this was discussed in meetings that FE2 participated in. "There's no way they couldn't have known," FE2 said, referring to senior leadership's knowledge of the declining demand.

213.    The fact that information demonstrating that Defendants' statements were false and misleading were in P&L statements, forecasts, and other documents that were circulated amongst their direct reports and are of the kind of documents regularly reviewed by CFOs and CEOs, and that declining demand was known throughout the Company at all levels, support a strong inference of scienter.

**D.    Lowe's Admitted Frustration With the Low Price at Which Wolfspeed Stock Was Trading Supports a Strong Inference of Scienter**

214.    During the Class Period, Lowe repeatedly asserted that the trading price of Wolfspeed stock did not fairly reflect the value of the Company. In so doing, in each instance, he pointed to the alleged false and misleading statements – the asserted operational turnaround and purported success of the MVF ramp as well as the continued high demand for the Company's products – as reasons that the Company's stock price should be higher.

215.    On May 1, 2024, Wolfspeed reported its results for the third quarter of fiscal year 2024.  In the corresponding earnings call, Lowe complained "*we believe the market is not fairly valuing the company*, consistent with the technology and the business we have built or the strategic potential of the business." Thereafter, Lowe asserted, "*We are on track to achieve 20% wafer start utilization in Mohawk Valley by June of this year*. And to give you a sense of the progress we're making *as of April, we are already at more than 16% utilization based on wafer starts per week, making us extremely confident on our ability to achieve our target in June of 2024*." On the issue of demand, Lowe stated, "*we remain substantially supply constrained for our silicon carbide devices. As demand remains well above our current supply, we can be nimble and shift much of our supply to other customers to accommodate for these near-term changes*."

216.    During the August 21, 2024, earnings call, Lowe once again proclaimed that "*the market is clearly not valuing the company consistent with our technology, the business we've*

*built or the strategic potential of the business*." Lowe then stated, "*we expect to be able to support a 25% wafer start utilization at Mohawk Valley in the September quarter*, 1 quarter ahead of plan. As a result of continued productivity improvements, *we are also now expecting Building 10 to support 30% wafer start utilization at Mohawk Valley in the March quarter of 2025*." On the issue of demand, Lowe stated, "*Our revenue in the EV market continues to be strong because we are just at the beginning of the ramp of our automotive business across several geographies*."

217.    On September 4, 2024, Wolfspeed presented at Citi's 2024 Global TMT Conference. During the question-and-answer presentation, Defendants again pertinently addressed Mohawk Valley's purported success and continued ramp while speaking to Wolfspeed's poor stock performance throughout calendar 2024. A Citigroup Inc. analyst asked "why do you think your stock price has underperformed by so much this year? What are the investors missing?" In response, Lowe emphasized that "getting the operations [at MVF] in better shape" has "been a very, very key focus of me. I've been in Mohawk Valley. I've been in our materials factories pretty consistently during this time. And I think one thing that I think is -- not one thing, but several things have happened":

> Number one, Mohawk Valley has now turned into a very good asset for us in terms of production quality, yield, et cetera. Feeding Mohawk Valley out of Building 10 has also substantially increased. *We announced that we hit 20% utilization in Mohawk Valley and that's because Building 10 was able to deliver the material to them. And we also announced on our last earnings call that Building 10 will actually be able to support a 30% utilization in Mohawk Valley, which is a 50% increase off the same number of growers*. So which -- maybe it's not that obvious, but that means our yield out of those growers is 50% better than anticipated. *The yields in Mohawk Valley are now ahead of where we intended -- not intended, where we expected them to be at this point, and we still have quite a ways to go to get to what we call entitlement yield*.

***

*So I think there's -- for the last 2 years, there's been a question of, can we get 200- millimeter going? And I think that answer has been -- that question has been answered pretty substantially*.

218.    Defendants' repeatedly asserting that the price of Wolfspeed stock should be higher just before making the alleged false and misleading statements supports a strong inference of scienter

### E.    The Suspicious Timing of the Company's Purported Operational Turnaround Supports a Strong Inference of Scienter

219.    As detailed above, prior to the Class Period, the MVF ramp had experienced numerous delays, with Defendants repeatedly resetting investor expectations for the facility to be operating at a meaningful level. Following the most recent reset announced during the April 26, 2023 earnings call (a quarter before the Class Period), analysts made clear that another reset would not be tolerated by the market.

220.    For example, an April 26, 2023, Piper Sandler report stated, "***probably the largest and most meaningful item in the earnings call was the delay in the ramp of the MVF facility***."

221.    An April 26, 2023, Wells Fargo report stated, "***Timing of Mohawk Valley Ramp is Key***."

222.    An April 26, 2023, BNP Paribas report stated, "***Main takeaway from conf-call is that after a 1 quarter pushout in FQ2, the co has now further pushed out the ramp-up of its MVF fab by another few quarters***."

223.    An April 27, 2023, Morgan Stanley report stated, "***It is important that management resolves these issues***, as this seems like more than a transitory problem. FY24 guidance, for the first full year of Mohawk Valley, was the guidepost for much of the last 3 years, so ***to fall this far short is a blow to investor confidence***."

224.    An William Blair report stated, "We believe this reset is finally deep enough for realistic expectations, and *we believe this is the last one investors will stomach*."

225.    The sudden and inexplicable operational turnaround for the MVF ramp after numerous delays was met by investors with equal astonishment.

226.    For example, an August 2, 2023, JPMorgan report stated, "*what we believe should be more of a focal point for investors, is that F4Q results were headwind free as it relates to ongoing ramps at Durham, MVF and now JP following multiple quarters of execution challenges and delays*."

227.    An October 30, 2023, TD Cowen report stated, "*Shares are up >10% as incremental signs of MVF progress are a small, but important, step forward after multiple messy quarters*[.]" "*Importantly, management reiterated it's on track to hit 20% MVF utilization by the end of F2024, and $100M in revenue by C4Q24 —an important proof point for investors who were skeptical of a meaningful revenue ramp*", and "*Overall, after a number of messy quarters, we welcome a comparatively quiet call with output heading in the right direction*."

228.    An October 31, 2023, William Blair report stated, "Wolfspeed executed. *Shares are up 12% after a quarter of doing what the company said it would do*. Wolfspeed is making progress ramping up Mohawk Valley, Building 10 is on track to supply up to 20% utilization…"

229.    An October 31, 2023, J.P. Morgan report stated, "*we believe investor focus will be on the increased confidence expressed by the management team relative to the ramp for the Mohawk Valley Fab (MVF), which has been the keystone to the bull thesis on the shares, and has been overshadowed in recent quarters by execution mishaps*."

230.    Following the revelation of the truth on November 6, 2024, analysts recognized that the operational difficulties surrounding the MVF ramp were a mirage. For example, a William

Blair report stated that "the outlook once again is well below expectations . . . ***The lack of operational progress is likely to weigh on the shares, creating a natural overhang in a name where management has lost credibility*.**"  The analyst went on to observe that "***Mohawk Valley has stalled in the rate of growth; by our estimate Wolfspeed is now over 30 months behind schedule***."

231.    The sudden and inexplicable apparent reversal of the operations of the MVF ramp support a strong inference of scienter.

**F.    Defendants' Suspicious Assertions that EV Demand for Wolfspeed's Products Was Increasing When End-Market Demand Was Decreasing Support a Strong Inference of Scienter**

232.    As other companies serving the EV market were reporting a decline in demand, Defendants continued to reassure investors that the demand for Wolfspeed products was not merely holding firm, but actually increasing.

233.    For example, during the January 31, 2024, earnings call, Lowe stated that there was a "***continuing and growing robust demand for silicon carbide***," and "***This diverse customer base across the global electric vehicle industry, with multiple OEMs and Tier 1s, gives us confidence to continue with our expansion plan and further illustrates why we believe our supply will be continuing to work to catch up with demand over the next few years***."

234.    Similarly, Reynolds stated, "***the demand continues to remain strong based on the customers that we have in front of us and it really just be about ramping, delivering substrates to the fab and continuing to drive productivity and output there***."

235.    Analysts were pleasantly surprised by Defendants' representations. For example, a February 1, 2024 Canaccord Genuity Capital Markets report stated, "***the big stuff is starting to happen. Mohawk Valley is ramping nicely***, 200mm crystals are showing "excellent quality", ***and EV demand remains strong despite all the industry hullabaloo.***"

236.    On March 4, 2024, Wolfspeed presented at Morgan Stanley's Technology, Media & Telecom Conference 2024, during which Lowe claimed that the Company's demand estimate was conservative and "***Despite taking all of those sort of judgments, we still have a demand scenario that is substantially higher than our supply for the foreseeable future***."

237.    During the May 1, 2024, earnings call, Lowe stated, ***we continue to see a ramp of EVs that have adopted our silicon carbide devices.*** While this is a disruptive time in industry, and we continue to see OEMs adjusting and modifying their near-term EV production plans, ***we remain substantially supply constrained for our silicon carbide devices. As demand remains well above our current supply, we can be nimble and shift much of our supply to other customers to accommodate for these near-term changes***." Later, Lowe repeated, "***EV product demand continues to outstrip our available capacity to serve that demand***" and "***Obviously, we have automotive demand that is higher than our current supply.***"

238.    During the same call, Reynolds similarly stated, "***The amount of demand still outstrips our supply***."

239.    Analysts were again pleasantly surprised by Defendants' representations. For example, a May 1, 2024, Canaccord Genuity Capital Markets report stated, (i) "Mohawk Valley is ramping well. ***The materials business is humming. EV demand/ pipeline is strong despite a wobbly end market***;"

240.    On May 20, 2024, Wolfspeed presented at JPMorgan Global Technology, Media and Communications Conference 2024.  In response to the moderator's question "Just walk us through what you're seeing from customers in the EV market? How would you characterize the EV market demand outlook right now…?, Lowe responded:

> Well, I'll start by saying we've actually won a pretty substantial amount of business over the last 5 years. And a lot of that is just in the early phase of transitioning to

going into production. From an EV perspective, we've got, I think, 120 different car models from 30 different OEMs going into production over the next couple of years. *So the talk about a slowing of existing EVs is not what we're in right now*.

*We remain capacity limited. The demand for our product is higher than the capacity we have. And the adoption of silicon carbide has also been substantially higher than we originally anticipated*.

\*\*\*

And the last point I'd make is, just yesterday, Sunday, 1 p.m. I had a customer call, looking for more product this year, more product next year, more product in 2026. *So an increasing demand*.

241.    Later during the conference, Lowe repeated, "*we remain in a situation where the demand for the silicon carbide chips from us remains ahead of what our supply is*" and "*the demand for silicon carbide is higher than the supply*."

242.    During the August 21, 2024, earnings call, Lowe stated, (i) "*Our revenue in the EV market continues to be strong because we are just at the beginning of the ramp of our automotive business across several geographies*" and (ii) "*Our EV revenue has grown for 3 consecutive quarters despite a declining auto semiconductor market because some of the EV design-ins we've accumulated over the last 5 to 7 years are just beginning to ramp. We achieved an additional $2 billion in design-ins in fiscal Q4, bringing our fiscal 2024 total to over $9 billion of design-ins*."

243.    During the same call, Reynolds similarly stated that while "*supply and demand are more matched up, we do continue to see some significant growth into the December quarter and into the first half of calendar year 2025*."

244.    Analysts again were pleasantly surprised. For example, an August 22, 2024, Roth Capital Partners, LLC report stated, (i) "*EV Growth Remains Real w Chunky Backlogs*."

245.    Defendants' repeated assertions that Wolfspeed, and Wolfspeed alone, was seeing an increase in demand for the foreseeable future while the EV market generally was experiencing declining demand supports a strong inference of scienter.

### G.    The Suspiciously Timed Firing of Lowe Supports A Strong Inference of Scienter

246.    On November 18, 2024, less than two weeks after the end of the Class Period, Wolfspeed announced the immediate removal of Lowe as CEO of the Company.

247.    Notably, the announcement did not state that Lowe had resigned or was leaving to pursue other opportunities. Rather, the announcement stated that the Company's Board of Directors had "*determined* and agreed with Lowe that he will depart this month from his roles as Wolfspeed's President and [CEO] and as a member of the Board." Moreover, Chairman of the Board, Thomas Werner, stated in the announcement, "Since joining the Company as CEO in 2017, Gregg has spearheaded our transition into a leading, pure-play silicon carbide company well-positioned to capture the long-term opportunities ahead. The Board has always been focused on driving long-term value, and at this inflection point in Wolfspeed's journey, *the Board agreed that this is the right time for a leadership transition*."

248.    By contrast, in Lowe's statement in the announcement, he did not assert that he had made the decision to leave the Company. Instead, Lowe stated, "I am honored to have had the opportunity to lead Wolfspeed and work alongside such talented and dedicated colleagues. Over the past seven years, we have transformed Wolfspeed into the only pure-play and vertically integrated silicon carbide operator in the country to capitalize on the structural and long-term demand for next generation semiconductor technology. While there is work still to be done, I have every confidence that Wolfspeed will execute on its strategic priorities and extend its silicon carbide leadership in the years to come."

249.    Analysts were surprised by the suddenness and timing of Lowe's firing but recognized that it was related to the poor operations at MVF and demand issues. For example, a November 18, 2024, JP Morgan report described the departure of Lowe as "sudden, particularly following the announcement of the CHIPS PMT as well as disclosures around significant restructuring actions" and recognized that it was likely tied to "share price performance", "broader execution challenges", "ramping new greenfield facilities" and "muted EV demand backdrop."

250.    A November 18, 2024, Piper Sandler report stated, "We believe that the combination of execution issues particularly around the Mohawk Valley Fab coupled with the company's capital strategy has led to the departure."

251.    The suspicious timing and nature of Lowe's termination supports a strong inference of scienter.

**H.    The Terms of Wolfspeed's Debt Instruments Supports A Strong Inference of Scienter**

252.    On June 23, 2023, Wolfsped sold $1.25 billion aggregate principal amount of senior secured notes due 2030 (the 2030 Senior Notes).

253.    The 2030 Senior Notes Indenture contains a liquidity maintenance financial covenant requiring the Company to have an aggregate amount of unrestricted cash and cash equivalents maintained in accounts over which the trustee and collateral agent has been granted a perfected first lien security interest of at least $500.0 million as of the last day of any calendar month (the Liquidity Covenant).

254.    Upon the Company achieving 30% utilization at MVF (in addition to certain related revenue milestones) over a six month period, the level of the Liquidity Covenant shall be permanently reduced to $325.0 million. Upon the Company's achieving 50% utilization at MVF

(in addition to certain related revenue milestones) over a six month period, the Liquidity Covenant will be permanently reduced to zero,

255.    In addition to the motives discussed above, the terms of the Liquidity Covenant for the 2030 Senior Notes created an additional motive for Defendants to inflate the MVF utilization rate and further supports a strong inference of scienter.

## X.    LOSS CAUSATION

256.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Wolfspeed common stock and operated as a fraud or deceit on Class Period purchasers of Wolfspeed stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Wolfspeed common stock declined precipitously as the prior artificial inflation came out of the stock's price.  The decline in the price of Wolfspeed common stock was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. Plaintiffs and other Class members purchased Wolfspeed common stock at artificially inflated prices, causing them to suffer damages as complained of herein.

257.    By misrepresenting the adverse facts detailed herein to investors, Defendants presented a misleading picture of Wolfspeed's business, operations, financial condition, risks, and future financial prospects. As a result of their purchases of Wolfspeed common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Wolfspeed common stock to trade at artificially inflated levels throughout the Class Period.

258.    On June 20, 2024, *Reuters* published an article entitled "Wolfspeed plant delayed as EU's chipmaking plans flounder."  The *Reuters* article stated, in relevant part:

> Wolfspeed [. . .] has delayed plans to build a $3 billion plant in Germany, highlighting the European Union's struggle to increase semiconductor production and reduce its reliance on Asian chips.
>
> The planned plant in the state of Saarland, which would make computer chips used in electric cars, has not been scrapped entirely and the company is still seeking funding, a spokesperson said.
>
> But, ***having cut capital spending following weakness in the European and U.S. EV markets***, North Carolina-based Wolfspeed is now focused on ramping up production in New York, the spokesperson added. The company won't start construction in Germany until mid-2025 at the earliest, two years later than its original target.
>
> Wolfspeed has been under pressure from an activist investor to improve shareholder value after its stocks fell around 51% over the past year.

259.    The June 20, 2024, disclosure partially revealed that demand for Wolfspeed's products as well as the Company's current and future financial condition and growth prospects may not have been as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

260.    Following the publication of the *Reuters* article, Wolfspeed's stock price fell $2.24 per share, or 8.62%, to close at $23.76 per share on June 20, 2024.

261.    On August 21, 2024, after the market closed, the Company announced its fourth quarter fiscal year 2024 results and had an associated earnings call. The Company reported adjusted quarterly losses of 89 cents per share, higher than analyst's expectations, and revenue fell to $200.7 million for the quarter, lower than analyst's expectations. During the call, the Company reported plans to close its production facility in Durham, N.C., as the Company tries to cut costs.

262.    The August 21, 2024, disclosure partially revealed that demand for Wolfspeed's products as well as the Company's current and future financial condition and growth prospects

may not have been as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

263.    Wolfspeed stock opened on August 22, 2024 at a price of $13.76 per share and dropped to $12.83 per share to close on August 22, 2024, a decline of around $0.93 and around 6.76% in the span of one day.

264.    As the market continued to process this news, the stock dropped during the period of August 26, 2024 to September 03, 2024. The market opened on August 26, 2024 at a price of $13.82 per share, and steadily dropped in the next several days to $9.11 per share to close on September 3, 2024, a decline of $4.86 and around 34.78%.

265.    On November 6, 2024, after the market closed, Wolfspeed released its first quarter results for fiscal year 2025, reporting consolidated revenue of approximately $195 million, of which MVF contributed approximately $49 million in revenue. For its second quarter of fiscal 2025, Wolfspeed targeted revenue from continuing operations in a range of $160 million to $200 million, a midpoint of $180 million, well below analysts' estimate of $214.7 million.

266.    Defendants conducted an earnings call to discuss the reported results, the reported slowdown in EV demand, and reduced guidance. During the call, CEO Lowe acknowledged that the revenue from MVF was "lower than originally anticipated due to market demand and customer pushouts" and he reduced the guidance for revenues from MVF to the range of $50-70 million.  In pertinent part, Lowe identified "***the slower growth of EVs adoption***" and "***EV customers revis[ing] their launch time lines as the market works through this transition period***" as reasons for the poor results and lower guidance, as well as for certain steps that the Company was taking. Lowe stated:

> These steps include: ***first, we have begun to execute our plan to close our 150-millimeter device fab on the Durham campus***. This closure will be a phased

process over the next 9 to 12 months, and we are currently working with customers to finalize the transition time frame.

***Second, we are optimizing our capacity footprint by closing our epitaxy facility in Farmers Branch, Texas and indefinitely suspending our construction plans for the next device fab in Saarland, Germany***. We expect to ramp down final production in Farmers Branch by the end of this calendar year.

***Regarding Saarland, we have spoken with government officials and Zeta and they understand that we would need to see a clear acceleration of our customer demand and additional capacity requirements before we would reconsider construction at the site***. While we are indefinitely suspending our activities in Saarland at this time, should we determine to build a fab in the future, the in-store site remains our preferred site in Europe.

***Third, we have implemented a workforce reduction in our administrative and other business functions. This reduction, along with the factory closures, will impact approximately 20% of our total employee base. This reduction will better align our business with current market conditions and customer demand***. These facility and head count restructuring initiatives are targeted to generate annual cash savings of approximately $200 million, significantly improving our projected cash flow from operations over time. These actions will foster a stronger, more agile company, ready to seize the opportunities ahead. Many of these reductions have already occurred, and we expect to complete the majority of the actions by the end of the year.

And lastly, we are further reducing our fiscal 2025 CapEx guidance range by an additional $100 million to a new range of $1.1 billion to $1.3 billion, excluding federal incentives. This reduction will align the pace of our CapEx spend with the broader shift in EV and I&E market demand that we are currently observing.

267.    CFO Reynolds further elaborated on the financial details of decline in demand and

the plan to cut costs to match such reduced demand, stating, in pertinent part, as follows:

***

Now moving on to our quarterly results. We generated $195 million of revenue for the quarter, slightly below the midpoint of our guidance and down 3% sequentially. We recognized power revenue of $97 million, down quarter-over-quarter, driven largely by lower demand in the industrial and energy sectors. ***Revenue contribution from Mohawk Valley was $49 million, up more than 20% quarter-over-quarter but at the lower end of our range due to lower customer demand within the quarter.***

*** 

Finally, turning to our Q2 2025 guidance. *We target Q2 2025 revenue to be between $160 million to $200 million, reflecting the current macro environment and our demand visibility related to EVs*. We continue to have ongoing customer demand discussions that we expect to provide more clarity for calendar 2025 as we complete the quarter. *The rights revenue at Mohawk Valley is targeted to be between $50 million to $70 million for Q2*.

268.     Addressing the MVF utilization, Reynolds stated "*we will reduce utilization this quarter to target an inventory burn* as well as complete the scheduled maintenance shutdowns I just mentioned."

269.     A question-and-answer segment followed the Defendants' prepared remarks, during which Defendants discussed the potential lost revenue caused by shuttering the Durham facility.  In pertinent part, in response to a JPMorgan Chase & Co. analyst's question, "And as you talk to customers around transitioning the capacity that you're currently running out of Durham to Mohawk, what's your sense on the appetite to transition this capacity versus perhaps customers potentially being more reluctant to do so?," Lowe stated:

> *Obviously, anytime you transition from one fab to another, the customers have an input into that, we're engaged with them… I think we're transitioning the vast majority of the revenue up to the factory. There will be some parts that don't transfer, but the vast enough amount of revenue is planning to transfer to Mohawk Valley*.

270.     The November 6, 2024, disclosure revealed that demand for Wolfspeed's products, operations at MVF, as well as the Company's current and future financial condition and growth prospects were not as Defendants had been representing. The disclosure is also a materialization of the risks created by Defendants' false and misleading statements.

271.     Investors and analysts reacted immediately to Wolfspeed's revelation.  The price of Wolfspeed's common stock declined dramatically.  From a closing market price of $13.71 per

share on November 6, 2024, Wolfspeed's stock price fell to $8.33 per share on November 7, 2024, a decline of 39.24% in the span of just a single day.

272.    Analysts similarly were shocked by the revelations concerning the drop in EV demand, the stalled ramp of MVF, and the impact on the Company's current and future operations as a result. For example, a William Blair reported stated that "the outlook once again is well below expectations . . . ***The lack of operational progress is likely to weigh on the shares, creating a natural overhang in a name where management has lost credibility***." The analyst went on to observe that "***Mohawk Valley has stalled in the rate of growth; by our estimate Wolfspeed is now over 30 months behind schedule***. The analyst further recognized, "if the headwinds are demand related, how valuable are the design-in and design-wins?"

273.    Similarly, JPMorgan highlighted that Wolfspeed "management's disclosures of a worsening demand backdrop relative to EV and I&E Power Devices as well as Materials is now likely ***to diminish the confidence around stabilization that was starting to build with investors***," and "we believe the combination of a sluggish demand backdrop across EVs and I&E, which appears to have moderated further, with a long road of execution still ahead of the company, and many moving pieces to secure the full extent of funding available as part of CHIPS Act will delay improvement in investor appetite."

274.    The decline in the price of Wolfspeed common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Wolfspeed common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

275.    The economic loss (*i.e.*, damages) suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Wolfspeed common stock and the subsequent significant declines in the value of Wolfspeed common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Wolfspeed securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

277.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Wolfspeed securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Wolfspeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

278.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

279.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

280.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Wolfspeed;

- whether the Individual Defendants caused Wolfspeed to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Wolfspeed securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

281.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## I.    FRAUD-ON-THE-MARKET PRESUMTION OF RELIANCE

282.    The market for Wolfspeed common stock was an efficient market during the Class Period for the following reasons, among others:

- Wolfspeed's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

- As a regulated issuer, Wolfspeed field periodic reports with the SEC and/or NYSE;

- Wolfspeed regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major news wire services and through wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Wolfspeed common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

- Unexpected material news concerning Wolfspeed was rapidly reflected in Wolfspeed share price.

283.    Based upon the foregoing, the market for Wolfspeed promptly digested current information regarding Wolfspeed from all publicly available resources and reflected such information in Wolfspeed's share price.  Accordingly, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

284.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Wolfspeed common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Wolfspeed common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

285.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## II.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

286.    Neither Plaintiffs nor the Class need prove reliance—either individually or as a class—because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Against Defendants for Violation of Sections 10(b) of
### The Exchange Act and Rule 10b-5 Thereunder

287.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

288.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

289.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Wolfspeed securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Wolfspeed securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

290.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Wolfspeed securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Wolfspeed's finances and business prospects.

291.    By virtue of their positions at Wolfspeed, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

292.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Wolfspeed, the Individual Defendants had knowledge of the details of Wolfspeed's internal affairs.

293.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Wolfspeed. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Wolfspeed's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Wolfspeed securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Wolfspeed's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Wolfspeed securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

294.    During the Class Period, Wolfspeed securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Wolfspeed securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Wolfspeed securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Wolfspeed securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

295.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Against Individual Defendants for Violation of Section 20(a)
of the Exchange Act**

297.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

298.    During the Class Period, the Individual Defendants participated in the operation and management of Wolfspeed, and conducted and participated, directly and indirectly, in the conduct of Wolfspeed's business affairs.  Because of their senior positions, they knew the adverse non-public information about Wolfspeed's misstatement of income and expenses and false financial statements.

299.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Wolfspeed's financial condition and results of operations, and to correct promptly any public statements issued by Wolfspeed which had become materially false or misleading.

300.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Wolfspeed disseminated in the marketplace during the Class Period concerning Wolfspeed's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Wolfspeed to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Wolfspeed within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Wolfspeed securities.

301.    Each of the Individual Defendants, therefore, acted as a controlling person of Wolfspeed.  By reason of their senior management positions and/or being directors of Wolfspeed, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Wolfspeed to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Wolfspeed and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

302.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Wolfspeed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: May 5, 2024

82

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mjwernke@pomlaw.com


**ROBBINS GELLER RUDMAN & DOWD LLP**
Samuel H. Rudman
Alan I. Ellman (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com
Email: aellman@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*


**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff William Maizner*

83